HERBERT R. BARRETT AND JOYCE S. BARRETT, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 970–71.   Filed May 11, 1972.

*Jerold A. Fink*, for the petitioners.
*Donald K. James*, for the respondent.

#### OPINION

BRUCE, *Judge:* Respondent determined a deficiency in self-employment tax of the petitioners for the calendar year 1969 in the amount of $538.20. The only issue is whether $12,000 received by the petitioner, Herbert Barrett, under a contract entered into between the Philip Carey Manufacturing Co. and petitioner on January 5, 1962, is self-employment income subject to tax under section 1401 of the Internal Revenue Code of 1954.[1] The facts are stipulated and the stipulation

---

[1] All statutory references herein are to the Internal Revenue Code of 1954, effective during the year 1969, unless otherwise indicated.

of facts together with the exhibits attached thereto are incorporated herein by this reference.

The petitioners are, and were during 1969, husband and wife. They filed a joint Federal income tax return for the calendar year 1969 with the district director of internal revenue at Cincinnati, Ohio. Their residence at the time of filing the petition herein was in Cincinnati.

Prior to December 31, 1967, when his full-time services were terminated, Herbert R. Barrett was executive vice president of the Philip Carey Manufacturing Co., Cincinnati, Ohio (hereinafter called Philip Carey). In 1967 Philip Carey and Glen Alden Corp. (a Pennsylvania corporation) effectuated the terms of a merger agreement between the two corporations, as a result of which the assets of Philip Carey were transferred to a new, wholly owned Ohio subsidiary, also named the Philip Carey Manufacturing Co. Subsequently, this new Philip Carey was merged into Panacon Corp.

On January 5, 1962, petitioner Herbert R. Barrett entered into an agreement with Philip Carey providing for his full-time employment through October 31, 1967, and thereafter until such full-time services would be terminated as provided in the agreement, at $40,000 a year plus such additional benefits as are authorized. The agreement further provided that upon the completion of the petitioner's full-time services, the petitioner would be paid $12,000 a year until October 31, 1977, providing that (1) he would not compete with Philip Carey, directly or indirectly, and (2) he would render advisory and consulting services to Philip Carey whenever reasonably requested.

The agreement of January 5, 1962, provided as follows:

### AGREEMENT

THIS AGREEMENT, made this 5th day of January, 1962, but effective January 1, 1962, by and between THE PHILIP CAREY MANUFACTURING COMPANY, a corporation organized and existing under the laws of the State of Ohio (hereinafter called the "Company"), and H. R. BARRETT, of Glendale, Ohio (hereinafter called "Barrett"),

### WITNESSETH: THAT

WHEREAS, Barrett for many years has been an executive of the Company and the Company desires for a period of years to be assured of the continuance of his fulltime services and thereafter desires to be assured that he will not compete with the Company, but, on the other hand, will render consulting and advisory services, if and to the extent called upon;

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties agree as follows:

1. The Company hereby employs Barrett to render fulltime services to the Company for the period beginning on the effective date of this agreement and extending through October 31, 1967, and thereafter until such fulltime services are terminated as hereinafter provided. During such period, Barrett diligently shall

perform such executive and administrative duties as shall from time to time be assigned to him by the Board of Directors, and he agrees to give his full time and attention and his best efforts to the business and affairs of the Company. During such period, Barrett will act as an officer, if elected to office, without additional compensation. The foregoing shall not be construed to prevent Barrett acting as director or officer of other non-competing corporations when such activity does not occupy a substantial part of his business time.

2. During the period of fulltime employment, Barrett's salary shall be Forty Thousand Dollars ($40,000) a year. In addition to such salary, Barrett shall be entitled to reimbursement for all reasonable expenses incurred in connection with the business of the Company, to participate in all pension, profit-sharing and similar plans of the Company for the benefits of its executives, and shall also be entitled, but only if and when voted by the Board of Directors of the Company or its Executive Committee, to such bonus or additional compensation as the Board of Directors or its Executive Committee may from time to time deem to be warranted by his performance of services and the condition of the Company.

3. During the period of fulltime employment, in the event that Barrett shall be unable to perform his services by reason of illness or other disability, and such disability should continue for, at least, twelve (12) successive months, the Company shall have the right to terminate the period of fulltime employment, but in such event Barrett shall become entitled to be paid under the subsequent provisions of this agreement in which it is provided that through October 31, 1977, he will not compete with the Company and will render consulting or advisory services to the extent as hereafter provided for. Similarly, at any time on or after October 31, 1967, on written notice given, at least, ninety (90) days prior thereto by the Company to Barrett or by Barrett to the Company, fulltime employment of Barrett by the Company will cease, but in such event the Company will then make the payments to Barrett as provided for in subsequent paragraphs of this agreement under which Barrett will agree not to compete with the Company and will render consulting and advisory services.

4. Upon the cessation of fulltime employment either by reason of the disability of Barrett, as above provided for, or upon the giving of notice of election by either the Company or Barrett, as above provided for, Barrett agrees that prior to October 31, 1977, he will not compete with the Company, directly or indirectly, through employment on a fulltime or parttime or on a consulting or advisory basis for any other business organization in any matter or in any manner which might be deemed to be competitive with or against the best interests of the Company. Similarly, during such period, Barrett will, unless disabled or incapacitated, render advisory and consulting services to the Company whenever reasonably requested so to do by the Company. If Barrett's physical condition so requires, such services shall be rendered at or near the place where Barrett is then residing or sojourning. During the period of such non-competition and during which Barrett, to the extent he is not disabled, shall be required to render consulting and advisory services, if and when called upon, the Company shall pay Barrett the amount of Twelve Thousand Dollars ($12,000) per year, payable in equal monthly installments of One Thousand Dollars ($1,000).

5. The period in which Barrett shall not compete with the Company and shall render advisory and consulting services when called upon, as above provided for, shall be that period of time from cessation of fulltime employment to October 31, 1977, subject to sooner termination in the event of the death of Barrett or in the event of violation by Barrett of his agreement of non-competition or his refusal to render reasonable advisory and consulting services, if not disabled. It is under-

stood and agreed that before the Company may terminate the agreement because of his failure not to comply with the non-competition provision or to render advisory and consulting services, the Company shall give Barrett, at least, twenty (20) days' notice of its intention to terminate and the reasons therefor. Such notices shall be served by delivery thereof in hand to Barrett or by sending the same by registered mail, return receipt requested, addressed to him at his last known address. Barrett shall have twenty (20) days after the delivery or mailing of said notice in which to cure any alleged default and to put himself in compliance with the terms of this agreement for the receipt of such payments. If Barrett shall establish that (1) the violation was unintentional and not in clearly marked disregard of any condition hereof, and (2) the violation has been discontinued, this agreement shall remain in full force and effect. Any waiver by the Company of the right to discontinue said monthly payments to Barrett shall not be construed as a waiver of any matter subsequently occurring.

6. This contract shall not be assignable by Barrett, but shall be binding upon any successors or assigns of the Company.

IN WITNESS WHEREOF, the parties have executed this agreement, in duplicate, on the day and year first above written.

[Signatures omitted.]

Petitioner's full-time employment by Philip Carey was terminated on December 31, 1967. Notice of such termination (as required by the agreement) was given him by the president of Philip Carey by letter dated September 18, 1967, which is as follows (salutation and signatures omitted):

### AGREEMENT OF JANUARY 5, 1962

Your agreement with the Company provides for your full time services through October 31, 1967 (which is your normal retirement date) and thereafter is subject to termination on 90 days notice by either party to the other.

You and I have discussed your retirement and have agreed that your full time association with the Company will terminate on December 31, 1967. Accordingly, this letter is the notice, required by the agreement, of cessation of such employment on December 31, 1967.

Since the termination of his full-time services on December 31, 1967, petitioner has rendered no advisory, consulting or other services for the Philip Carey Manufacturing Co., for Panacon Corp., or to any other affiliated corporation, nor has he been requested to render such services. Also, since that date the petitioner has not competed with either such company, directly or indirectly.

During the taxable year 1969, Philip Carey paid petitioner $12,000 as provided by the agreement of January 5, 1962.

In the petitioners' income tax return for 1969 they reported salary income of $11,666.76 for Herbert from Action Housing For Greater Cincinnati, salary of $5,971.50 for Joyce, annuity income of $8,215.08 from Philip Carey, and $12,000 under miscellaneous income as from "Consulting Contract—Philip Carey Corp." No Treasury Form W–2 relating to the consulting contract item was attached.

Respondent contends that the $12,000 Herbert R. Barrett received in 1969 under the agreement with Philip Carey was self-employment income subject to the tax imposed by section 1401, I.R.C. 1954. We do not agree.

In addition to other taxes, section 1401 imposes a tax for each taxable year on the "self-employment income" of every individual. The rate for 1969 is 6.3 percent for old-age, survivors, and disability insurance, and 0.60 percent for hospital insurance. Section 1402(b)(1)(E) limits "self-employment income" in 1969 to $7,800. Thus, the tax involved herein is 6.9 percent of $7,800, or $538.20.

"Self-employment income" is defined in section 1402(b) as the "net earnings from self-employment," and "net earnings from self-employment" is defined in section 1402(a) to mean the gross income derived by an individual from any "trade or business" carried on by such individual.

Section 1402(c) provides that "the term 'trade or business,' when used with reference to self-employment income or net earnings from self-employment, shall have the same meaning as when used in section 162 (relating to trade or business expenses), except that such term shall not include * * * (2) the performance of service by an individual as an employee." Section 162(a) provides that "IN GENERAL.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business."

Thus, the determination of the ultimate issue herein depends upon the question whether the $12,000 which petitioner received from Philip Carey in 1969 was income derived by him from a "trade or business" carried on by him.

Neither the Internal Revenue Code nor the court decisions contain any explicit definition of the phrase "trade or business," or of what constitutes "carrying on any trade or business." Various criteria have been suggested for consideration but no single factor of itself has been held controlling in all cases. See, for example, Rev. Rul. 58–112, 1958–1 C.B. 323. In *Higgins* v. *Commissioner*, 312 U.S. 212 (1941), rehearing denied 312 U.S. 714, the Supreme Court stated: "To determine whether the activities of a taxpayer are 'carrying on a business' requires an examination of the facts in each case."

In the present case, the terms of the agreement of January 5, 1962, are of primary importance. Petitioner was, and for some time had been, an executive vice president of Philip Carey. On January 5, 1962, in order that it might be assured of his full-time services for a period of years, and to be assured that thereafter he would not compete with it but would render consulting and advisory services to it, if and to the extent called upon, Philip Carey entered into an agreement with petitioner providing for his full-time employment through October 31,

1967, the date he would normally retire, and thereafter until such full-time services would be terminated as provided in the agreement, at $40,000 per year, and that upon completion of his full-time services he would be paid $12,000 per year until October 31, 1977, provided (1) that he would not compete with Philip Carey, directly or indirectly, "through employment on a fulltime or parttime or on a consulting or advisory basis for any other business organization in any matter or in any manner which might be deemed competitive with or against the best interests of the Company," and (2) that during such period, unless disabled or incapacitated, he would "render advisory and consulting services to the Company whenever reasonably requested so to do by the Company."

Petitioner's full-time employment was terminated on December 31, 1967, in the manner provided by the agreement, and thereafter, during the taxable year 1969, he was paid $12,000 as provided in the agreement of January 5, 1962. Since the termination of his full-time services, petitioner has rendered no advisory, consulting, or other services for Philip Carey, nor has he been requested to do so. Nor has he competed with it.

Both parties agree that noncompetition does not constitute the carrying on of a trade or business.

In support of his contention that the compensation in question was not self-employment income, petitioner cites the case of *McDowell* v. *Ribicoff*, 292 F. 2d 174 (C.A. 3, 1961), for the proposition that active participation is required in order for a person to be engaged in a "trade or business." In that case it was held that one who was the casual fiduciary of a relative's estate which required no extensive management activities and which did not contain a going business for administration was not engaged in a "trade or business" within the statutes governing social security rights of the self-employed. The Court of Appeals based its decision in that case substantially upon the reasonableness and applicability of Rev. Rul. 58–5, 1958–1 C.B. 322, which set out specific criteria or guides as to when a nonprofessional fiduciary is engaged in a "trade or business." The decision is, in our opinion, of no precedential value in the present case.

In the present case, we agree with respondent that the nature of the compensation in question depends upon the terms of the contract as originally entered into and is not altered by the subsequent inaction of the petitioner. Under the terms of the agreement of January 5, 1962, petitioner was, and continues to be obligated to render advisory and consulting services to Philip Carey whenever called upon to do so. In view of this continuing obligation, the fact that he has rendered no advisory or consulting services to Philip Carey, or been requested to do so, is immaterial.

On the other hand we do not agree with respondent's contention that, since the termination of his full-time services, petitioner has been engaged in a "trade or business" as a consultant. In *Deputy* v. *du Pont*, 308 U.S. 488, 499 (1940), Mr. Justice Frankfurter, in a concurring opinion joined in by Mr. Justice Reed, stated that " '* * * carrying on any trade or business,' within the contemplation of * * * [sec. 162], involves holding one's self out to others as engaged in the selling of goods or services." See also *White's Will* v. *Commissioner*, 119 F. 2d 619, 621 (C.A. 3, 1940) ; *McDowell* v. *Ribicoff*, *supra*.

Petitioner is clearly not engaged in offering his services as an adviser or consultant to others. On the contrary, he is specifically prohibited by the agreement of January 5, 1962, from rendering services of any kind, advisory or otherwise, to another employer which might be deemed competitive to or against the best interests of Philip Carey. In Rev. Rul. 69–98, 1969–1 C.B. 268, cited by respondent, it was held that an attorney serving as counsel for a railway company that paid him a retainer fee and exercised control only as to what was done, was not an employee of the company for railroad retirement tax purposes. The attorney in question was engaged in the general practice of law, maintained his own office, and served other clients. That ruling is clearly not applicable in the present case.

In view of our conclusion that petitioner was not engaged in carrying on a "trade or business" as a consultant, it is not necessary for us to determine whether or not he was in fact an employee of Philip Carey during the taxable year.[2] We hold that the $12,000 which petitioner received from Philip Carey in 1969 was not self-employment income subject to tax under section 1401.

*Decision will be entered for the petitioners.*

---

[2] See and compare, however, Rev. Rul. 55–695, 1955–2 C.B. 410, in which it was held that an employee who, upon reaching retirement age, was retained by her employer to train a replacement for her job, was an employee of the company for Federal employment tax purposes.