108 T.C. No. 10


UNITED STATES TAX COURT


WILLIAM R. AND MURIEL G. JACKSON, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 23558-94.                    Filed March 31, 1997.


P, a former insurance agent for State Farm
Insurance Companies, received termination payments
after his retirement on December 31, 1987, pursuant to
the terms of an independent contractor Agent's
Agreement. <u>Held</u>, the termination payments P received
were not "derived" from a trade or business carried on
by him as an insurance agent during 1990 and 1991.
Therefore, such payments are not subject to self-
employment tax under sections 1401 and 1402, I.R.C.,
and P is not liable for such tax. <u>Milligan v.
Commissioner</u>, 38 F.3d 1094 (9th Cir. 1994), revg. T.C.
Memo. 1992-655, followed.


William R. Jackson, pro se.

<u>John F. Driscoll</u>, for respondent.

OPINION

DAWSON, Judge: Respondent determined deficiencies in petitioners' Federal income taxes for the taxable years 1990 and 1991 in the amounts of $2,837 and $2,837.48, respectively.

At issue is whether termination payments received by William R. Jackson, a former independent agent for State Farm Insurance Companies, are subject to self-employment tax pursuant to sections 1401 and 1402.[1]

This case was submitted fully stipulated under Rule 122. The stipulation of facts and attached exhibits are incorporated herein by this reference. The pertinent facts are summarized below.

Petitioners resided in Lakeshore, Mississippi, at the time they filed their petition in this case.

On April 15, 1954, William R. Jackson (petitioner) was appointed as an exclusive agent of State Farm Insurance Companies (State Farm), which consisted of the following four subcompanies: (1) State Farm Mutual Automobile Insurance Co.; (2) State Farm Life Insurance Co.; (3) State Farm Fire & Casualty Co.; and (4) State Farm General Insurance Co.

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

While serving as an agent for State Farm, petitioner's duties included soliciting applications for insurance, collecting payments, and generally assisting State Farm policyholders. His compensation for his State Farm duties consisted of commissions on new policies and renewals on existing policies.

From April 15, 1954, to May 31, 1959, and from January 1, 1972, until his retirement on December 31, 1987, petitioner served as an agent of State Farm under a series of three separate State Farm Agent's Agreements. During these periods of time both petitioner and State Farm considered their association to be an independent contractor relationship. From June 1, 1959, to December 31, 1971, petitioner served State Farm as District Agency Manager, and he operated under a District Agency Manager Agreement. During that period both he and State Farm considered their relationship to be that of an employer and an employee.

Petitioner was 63 years of age when he retired. Being an independent contractor operating pursuant to the provisions of a previously executed State Farm Agent's Agreement, Form AA3 (the Agreement), petitioner closed his office on December 31, 1987, and did not thereafter engage in further insurance business of any kind. At that time his agency relationship with State Farm ended and he became eligible for "Termination Payments" under Section IV of the Agreement. In 1990 and 1991 petitioner received termination payments from State Farm of $21,885 and $21,837, respectively. On his Federal income tax returns for

1990 and 1991, he reported the amounts received as termination payments as income, but not for purposes of self-employment tax.

Because the Agreement was terminated more than 2 years after its effective date, the termination made petitioner eligible to receive 5 years of monthly termination payments from State Farm. Section II of the Agreement entitled "Compensation" did not include or refer to Section IV entitled "Termination Payments".

For the first post-termination year, Section IV of the Agreement required each of the State Farm companies to compute termination payments based on a percentage of petitioner's compensation during the previous 12 months, which was generally 20 percent of the income generated by personally produced policies in that year, less any deductions for commission charge-backs. For the subsequent 4 years of termination payments, each company was required to pay an amount equal to 1/12th the amount payable in the first post-termination year, less commission charge-backs. None of the termination payments depended upon the length of petitioner's service for State Farm and overall earnings.

Petitioner had no vested right to receive any termination payments. The Agreement conditioned such payments upon two contractual requirements; i.e., (1) returning all of State Farm's property within 10 days of termination entitled petitioner to 2 months of termination payments, and (2) refraining from competing

with all of the State Farm companies for a period of 1 year entitled petitioner to subsequent termination payments.

The Agreement also conditioned the termination payments upon certain adjustments to reflect: (1) The amount of income the State Farm companies received on petitioner's book of business during the first post-termination year, and (2) the number of his personally produced policies canceled during that year.

On Forms 1099-Misc sent to petitioner and the Internal Revenue Service for 1990 and 1991, State Farm reported the amounts of termination payments as nonemployee compensation attributable to service rendered by petitioner prior to his retirement.

In the notice of deficiency respondent determined that the amounts petitioner received from State Farm as termination payments constituted income from self-employment within the meaning of section 1401, and, therefore, were subject to self-employment tax.

We begin by pointing out that this case is indistinguishable from Milligan v. Commissioner, 38 F.3d 1094 (9th Cir. 1994), revg. T.C. Memo. 1992-655. Both cases involve former State Farm insurance agents who received termination payments under precisely the same provisions of Section IV of the State Farm Agent's Agreement. However, our opinion in Golsen v. Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), is not applicable here because an appeal of our decision

in this case would be to the United States Court of Appeals for the Fifth Circuit. Consequently, we must decide whether to follow the rationale of our Milligan opinion or the decision of the Court of Appeals for the Ninth Circuit that reversed us.

Petitioner, of course, urges us to follow the Court of Appeals' decision in Milligan and hold that the income he received as termination payments is not subject to self-employment tax. To the contrary, respondent asserts that we should adhere to our Milligan opinion and conclude that petitioner is liable for self-employment tax on the termination payments.

Section 1401 imposes a tax upon each individual's "self-employment income".[2] "Self-employment income" is defined in section 1402(b) as "net earnings from self-employment" with certain exceptions not relevant to this case. "Net earnings from self-employment" is defined in section 1402(a) as "gross income

_____

[2] A self-employed individual pays both the employer's and employee's share of the Social Security tax. The self-employment tax ("SECA") has two components, the Old Age, Survivors, and Disability Insurance portion (OASDI) and the rate for this portion of the SECA tax for 1990 and later years is 12.4 percent. The second component of the SECA tax is Hospital Insurance (Medicare) and the rate for this portion of the tax for 1990 and later years is 2.9 percent. The combined rate of the self-employment tax was 15.3 percent for both 1990 and 1991. In 1990 this tax was imposed on self-employment income of up to $51,300 and in 1991 on self-employment income of up to $53,400. In addition, in 1990 the Medicare tax of 2.9 percent was imposed on self-employment income of more than $51,300 but less than $125,000, and in 1991 on income of more than $53,400 but less than $130,200.

derived by an individual from any trade or business carried on by such individual, less the deductions allowed by this subtitle which are attributable to such trade or business".  It is well established that the earnings of an insurance agent who is an independent contractor are "self-employment income" subject to self-employment tax.  Simpson v. Commissioner, 64 T.C. 974 (1975); Erickson v. Commissioner, T.C. Memo. 1992-585, affd. without published opinion 1 F.3d 1231 (1st Cir. 1993).

In Newberry v. Commissioner, 76 T.C. 441, 444 (1981), this Court held that, for income to be taxable as self-employment income, "there must be a nexus between the income received and a trade or business that is, or was, actually carried on."  Under our interpretation of the "nexus" standard, any income must arise from some actual (whether present, past, or future) income-producing activity of the taxpayer before such income becomes subject to self-employment tax.  Id. at 446.  And section 1.1402(a)-1(c), Income Tax Regs., provides that gross income derived from an individual's trade or business may be subject to self-employment tax even when it is attributable in whole or in part to services rendered in a prior taxable year.  This Court and others have repeatedly applied the "nexus" test.[3]

---

[3]    In her reply brief in this case, respondent has requested that we apply a less restrictive test, the one reflected in Rev. Rul. 91-19, 1991-1 C.B. 186, 187, under which "the required nexus exists if it is clear that a payment would not have been made but for an individual's conduct of a trade or
                                             (continued...)

In applying the statutory definition of self-employment income, we must decide whether the income from the termination payments satisfies three requirements:  that it was (1) derived, (2) from a trade or business, (3) carried on by petitioner. Here, as in Milligan v. Commissioner, supra, petitioner agrees that he formerly carried on a trade or business as a State Farm insurance agent.  Thus, the narrow question presented is whether the termination payments were "derived", pursuant to the terms and conditions of the Agreement, from the carrying on of petitioner's previous work as a State Farm insurance agent.

This Court found in Milligan v. Commissioner, T.C. Memo. 1992-655, that the termination payments were the equivalent of deferred compensation which a State Farm agent, active or retired, would receive from policies sold in prior years.  On that basis, we held that the payments were "derived" from self-employment even though they were received in years subsequent to the business activity which generated them.  In other words, we found that there was a sufficient nexus between the income received and Mr. Milligan's trade or business to render the termination payments self-employment income.  We stated that termination payments were analogous to the renewal commission payments in Becker v. Tomlinson, 9 AFTR 2d 1408, 62-1 USTC par.

---

³(...continued)
business."  We decline to do so.  We will continue to apply the "nexus" test of Newberry v. Commissioner, 76 T.C. 441 (1981).

9446 (S.D. Fla. 1962), because they constituted the payment of previously earned commissions, similar to the deferred commissions that an active insurance agent would receive.

The Court of Appeals for the Ninth Circuit reversed our Milligan decision. In doing so, it acknowledged that in order for Mr. Milligan to receive termination payments, he had to have worked for State Farm as an independent contractor for 2 years or more. Milligan v. Commissioner, 38 F.3d at 1098. But the Court of Appeals stated that this fact by itself did not create a close enough nexus to establish that the termination payments were "derived" from Mr. Milligan's prior business activity within the meaning of the self-employment tax. The Court of Appeals concluded that Mr. Milligan had already been fully compensated for his services and that his business activity was not the "source" of the termination payments. Id. at 1099. It stated that the payments did not represent deferred compensation of previously earned commissions because none of Mr. Milligan's earnings were deferred; i.e., he had no vested right to payment of an identifiable amount of money. Nor were they renewal commissions or retirement income tied to Mr. Milligan's years of service and overall earnings. The Court of Appeals stated that "To be taxable as self-employment income, earnings must be tied to the quantity or quality of the taxpayer's prior labor, rather than the mere fact that the taxpayer worked or works for the

payor".  Milligan v. Commissioner, supra at 1098.  The Court of
Appeals then commented as follows:

>     Here, the Termination Payments were linked only to
> Milligan's previous status as a two year-plus independent
> contractor for State Farm.  Had Milligan not worked for
> State Farm, he never would have received the Termination
> Payments.  And, had he worked for State Farm for less than
> two years, or had he not generated any policies that
> produced commissions (or service compensation with respect
> to State Farm Auto, see ER 54-55:  section IV.A.1(a)) in the
> final pre-termination year, he would have received nothing.
>
>     Without more, this link between the disputed payments
> and any business activity carried on by Milligan does not
> satisfy the "derive" requirement. * * * [Id.]

It was further emphasized by the Court of Appeals that Mr.
Milligan had a contingent right to receive as termination
payments an uncertain amount of money or nothing depending upon
the level of his prior business activity leading to compensation
in his final year as an agent.  The payment amount depended in
part upon the level of his commissions on personally produced
policies.  However, the termination payments were subject to two
adjustments.  The State Farm companies adjusted the termination
payments to reflect the amount of income received on Mr.
Milligan's book of business during the first post-termination
year, and the number of his personally produced policies canceled
during that year.  If all of his customers had canceled their
policies during the first post-termination year, Mr. Milligan
would have received nothing.  The Court of Appeals reasoned that
in that sense the adjusted payment amount depended not upon Mr.
Milligan's past business activity, but upon a successor agent's

future business efforts to retain Mr. Milligan's customers and to generate service compensation for State Farm. The Court concluded that the disputed termination payments did not "derive" from Mr. Milligan's prior service.

We have set forth at length the reasons stated by the Ninth Circuit for reversing our Milligan opinion because we think they are persuasive. The case now before us is identical to Milligan in all material respects. Milligan cannot be distinguished, as it was in Schelble v. Commissioner, T.C. Memo. 1996-269, on appeal (10th Cir., Sept. 16, 1996), which involved "extended earnings" under a Career Agent's Agreement with American Family Insurance Companies, where this Court held that the taxpayer was subject to self-employment tax. But see, Gump v. United States, 86 F.3d 1126 (Fed. Cir. 1996), holding that "extended earnings" paid by Nationwide Mutual Insurance Company to a retired insurance agent were not "derived" from a trade or business carried on by him, and therefore he was not subject to self-employment tax. The Court of Appeals for the Federal Circuit found the Ninth Circuit's reasoning in Milligan persuasive, and stated that "we do not see any meaningful differences between Milligan and Gump that would counsel a different result". Id. at 1129.

We have given further thought to our conclusion in Milligan v. Commissioner, T.C. Memo. 1992-655, that the termination payments were the equivalent of deferred compensation.

Respondent, of course, urges us to adhere to that conclusion. But we are no longer inclined to do so because we now think such payments are not deferred compensation.

In a typical deferred compensation arrangement, an employee wants to postpone receiving a portion of the income to which he or she is entitled with the understanding that the income will be paid at a later time, usually upon retirement or other termination. Arizona Governing Committee v. Norris, 463 U.S. 1073, 1076 (1983); Minor v. United States, 772 F.2d 1472 (9th Cir. 1985). In these cases the employee chose to receive less than his or her agreed compensation when earned with the understanding that it would be paid out at some later time. The employer ordinarily contributes the amount designated by the employee to a fund established for that purpose.

To be sure, deferred compensation arrangements often exist with respect to insurance agents operating as independent contractors. Such a plan was discussed in Petr v. Nationwide Mut. Ins. Co., 712 F.Supp. 504 (D. Md. 1989). In that case, which involved a Nationwide plan, the insurance company "credited to an account maintained over the years for * * * [the agent] a percentage of * * * [the agent's] earnings based on his original and renewal fees for insurance policies." Id. at 505. The same plan was at issue in Darden v. Nationwide Mut. Ins. Co., 922 F.2d 203 (4th Cir. 1991), revd. on other grounds 503 U.S. 318 (1992). In that case the deferred compensation plan was funded by the

insurance company's "annual contributions based on an agent's earnings from original and renewal fees for insurance policies." Id. at 204.

Petitioner performed services for State Farm for 33 years. During his service he received commissions, service compensation, and renewal commissions. The record does not show that he was entitled to more compensation than he received once the termination payments were made. The Agreement contains no provisions to accumulate funds for termination payments. The language of Section IV of the Agreement indicates that the parties intended to create a payment scheme separate and distinct from compensation for services rendered.

Other distinctions between the termination payments and the ordinary deferred compensation plan are apparent. Deferred compensation which becomes payable after the recipient's retirement takes into account his overall earnings and years of service. The amount ultimately to be paid to the individual is a vested property right when earned which usually cannot be cut off arbitrarily. See Phillips v. Alaska Hotel and Restaurant Employees Pension Fund, 944 F.2d 509, 516 (9th Cir. 1991).

In those respects petitioner's termination payments differed from the ordinary deferred compensation plan. Under the Agreement, the amount of termination payments was not dependent upon the amount petitioner earned over his career. As long as he had at least 2 years of service prior to the termination, it made

no difference whether he had 2 or 33 years of service with State Farm for purposes of computing his termination payments. If he had received no commissions during the last 12 months, then he would not have been entitled to any termination payments.

The termination payments were linked to the amount of commissions paid to petitioner during the 12 months immediately preceding the termination. The amount was unaffected by petitioner's income during any prior period, by the total number of policies written over his career with State Farm, or by the total time period he served as a State Farm agent. No matter how long he had been a State Farm agent, petitioner's termination payments would be based only on his compensation for the last 12 months. Unlike deferred compensation, petitioner had no vested right to payment of any particular funds or any specific amount until the termination and unless he complied with the conditions of the Agreement to return property to State Farm and to refrain from competition.

Consequently, we conclude that the termination payments received by petitioner were not deferred compensation derived from self-employment and that our prior conclusion in Milligan v. Commissioner, supra, was incorrect. See also Darden v. Nationwide Mutual Insurance Co., supra, where the Court of Appeals for the Fourth Circuit held that an Extended Earnings Plan providing for similar payments was not a pension plan

subject to regulation under ERISA, but that the payments were in the nature of a buyout.

Respondent also maintains that the Courts of Appeals' decisions in Milligan and Gump are erroneous, based on the following arguments. First, it is argued that both decisions require that a portion of the taxpayer's compensation be set aside as earned, to provide a specific fund for the post-termination payments, else the taxpayer's business activity could not be considered the "source" of such payments. Thus, respondent construes both decisions as adding a "salary reduction agreement" or "direct tracing" requirement to the "derived from trade or business" standard that is not supported by other case law or the language of section 1402.

Second, respondent argues that the existence of post-termination conditions upon the agent's right to receive the termination payments should play no role in deciding whether such payments are subject to self-employment tax. Respondent stresses that the relevant statutory language provides no exclusion from self-employment tax liability for income which is received only after the recipient satisfies certain post-termination obligations. Respondent argues: (1) The fact that a post-termination obligation exists does not detract from the fact that an individual's right to receive income directly arises from his prior business activities; (2) the introduction of any such "post-termination obligation" exclusion into the statutory

framework of sections 1401 and 1402 would serve to encourage tax avoidance through the use of tax-motivated or other "condition subsequent" language, thereby interfering with the administrative enforcement of these provisions; and (3) the presence of a condition subsequent would have no impact upon the "source of income" requirement imposed by the section 1402 "derived from trade or business" standard because it would relate only to the amount or existence of income and not its source.

Third, respondent argues the appropriate section 1402 "derived from trade or business" test should be based on an "ordinary sense" or "common parlance" all-inclusive definition of the term "derived from".  Here again, it is contended that petitioner would not have received the termination payments "but for" his prior pursuit of his business as a State Farm insurance agent.  Thus, respondent argues, the "causal nexus" between petitioner's prior business activity and his receipt of a benefit from such activity is established notwithstanding the conditions subsequent that could have eliminated or substantially altered his right to receive any such benefit.

Finally, respondent argues that an overview of the employment tax provisions indicates that Congress intended to subject all payments to former workers, whether employees or independent contractors, to the imposition of employment tax on deferred compensation in the absence of a specific exception.

We have considered all of respondent's arguments, but we have not found them convincing.

In the interest of promoting uniformity, consistency, and fairness in the disposition of this issue with respect to former insurance agents who receive termination payments under similar contractual agreements, we follow the decision of the Court of Appeals for the Ninth Circuit in Milligan v. Commissioner, supra. Accordingly, upon further reflection and analysis, we hold that the termination payments petitioner received in 1990 and 1991 are not subject to self-employment tax. Because we conclude that the termination payments were not "derived" from the carrying on of petitioner's insurance business,[4] we need not decide the precise nature of the payments or specifically characterize them as a particular type of income. In other words, we need not decide in this case whether the termination payments are consideration for an agreement not to compete or the purchase of petitioner's agency, including its assets and goodwill. Milligan v. Commissioner, 38 F.3d at 1100.

---

[4] See, e.g., Ohio Farm Bureau Federation, Inc. v. Commissioner, 106 T.C. 222, 236 (1996), an analogous case, in which we pointed out that the statutory language defining "unrelated business income" in sec. 512(a) is similar to that contained in sec. 1402(a). There it was held that a lump-sum payment made by Landmark, Inc., to the taxpayer, pursuant to the terms of a nonsponsorship and noncompetition clause contained in their termination agreement, did not constitute unrelated business taxable income under sec. 511(a). We applied the rationale of Newberry v. Commissioner, 76 T.C. at 444. The Government did not appeal our decision, and the IRS has since revoked GCM 39865, TR-45-1437-90 (Dec. 12, 1991), which reached a contrary conclusion.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for petitioners</u>.

Reviewed by the Court.

COHEN, CHABOT, SWIFT, JACOBS, GERBER, WELLS, RUWE, COLVIN, LARO, FOLEY, VASQUEZ, and GALE, <u>JJ</u>., agree with this majority opinion.

CHIECHI, <u>J</u>., did not participate in the consideration of this opinion.

PARR, J., concurring:  I concur in the result reached by the majority.  I would conclude that the termination payments received by petitioner are not subject to self-employment tax, because in my judgment the payments are in the nature of a buyout of petitioner's business by State Farm.  Thus, they should be treated as a sale of a capital asset and are excluded from the definition of self-employment income under section 1402(a)(3)(A).  The payments are in reality either for the goodwill of petitioner's former insurance business (his books of customer accounts) or for a covenant not to compete.

If the termination payments are for goodwill, then they are attributable to the sale of a capital asset.  Goodwill has been characterized as the expectation that old customers will resort to the old place of business.  Goodwill is acquired by the purchaser of a going concern where the transfer enables the purchaser to step into the shoes of the seller.  See Decker v. Commissioner, 864 F.2d 51, 54 (7th Cir. 1988), affg. T.C. Memo. 1987-388; Winn-Dixie Montgomery, Inc. v. United States, 444 F.2d 677, 681 (5th Cir. 1971).  Here the terms of the Agreement between petitioner and State Farm allowed petitioner's successor agent to step into his shoes.  The successor agent continued the same business and sold insurance to the same customers.  Petitioner's goodwill, built up over a 33-year period, passed to the successor agent.  State Farm served as the conduit by making payments to petitioner under the termination arrangement, but

deducted the payments from the commissions payable to the successor agent, and, if there was any shortfall, the balance was paid from State Farm's general operating funds.

If the termination payments are for a covenant not to compete, they are not self-employment income. Payments attributable to a covenant not to compete are not "earned" income, Furman v. United States, 602 F.Supp. 444, 451 (D.S.C. 1984), affd. without published opinion 767 F.2d 911 (4th Cir. 1985), and they are not subject to self-employment tax. Barrett v. Commissioner, 58 T.C. 284 (1972); see also Ohio Farm Bureau Federation, Inc. v. Commissioner, 106 T.C. 222, 236 n.8 (1996). The purpose of the termination payments under the Agreement was to compel petitioner to refrain from entering into an insurance business as a competitor of State Farm. Clearly, State Farm wanted to protect the customer base for its products that had been developed by petitioner during the course of his active affiliation with the company.

It is significant that other courts in analogous agreements involving extended earnings arrangements have concluded that similar payments were in the nature of a buyout. See Darden v. Nationwide Mut. Ins. Co., 922 F.2d 203, 208 (4th Cir. 1991), revd. on other grounds 503 U.S. 318 (1992) (quoting Fraver v. North Carolina Farm Bureau Mut. Ins. Co., 801 F.2d 675, 678 (4th Cir. 1986)), as follows:

> The amount of the payment is tied to only one factor,
> the amount of business in the last year prior to

termination.  Finally, the payments are recouped from the individual's successor.  In sum, the benefits are in the nature of a buy-out in which the departing agent receives payments based on what he leaves behind in the way of business for his successor.  If the departing agent goes into competition with his successor, he is destroying the resource that would be used to pay him.

See also Petr v. Nationwide Mutual Ins. Co., 712 F.Supp. 504, 506 (D. Md. 1989); Wolcott v. Nationwide Mutual Ins. Co., 664 F.Supp. 1533, 1538 (S.D. Ohio 1987), affd. in part, revd. in part 884 F.2d 245 (6th Cir. 1989).

Finally, in Milligan v. Commissioner, 38 F.3d 1094, 1098 n.6 (9th Cir. 1994), which is identical to the instant case in all material respects, the Court of Appeals observed:  "Payments derived from the cessation of Milligan's business are not subject to self-employment tax.  * * * Nor does the self-employment tax apply to payments derived from noncompetition with State Farm."

BEGHE and DAWSON, JJ., agree with this concurring opinion.

HALPERN, J., dissenting:  The majority holds that certain termination payments received by petitioner after his retirement as an independent insurance agent are not subject to self-employment tax pursuant to sections 1401 and 1402 because such payments were not "'derived' from the carrying on of petitioner's insurance business".  Majority op. p. 17.  The majority is persuaded by the reasoning of the Court of Appeals for the Ninth Circuit (the Ninth Circuit) set forth in Milligan v. Commissioner, 38 F.3d 1094 (9th Cir. 1994), revg. T.C. Memo. 1992-655.  In Milligan, the Ninth Circuit recognized that, to be taxable as self-employment income under the Self-Employment Contributions Act of 1954 (SECA), sections 1401-1403, an individual's income must be (1) derived (2) from a trade or business (3) carried on by that individual.  Id. at 1097.  In Milligan, the taxpayer disputed only whether the termination payments there in question (which the majority implies were "indistinguishable" from the payments here in question) were "derived" from the trade or business carried on by him.  Relying on our opinion in Newberry v. Commissioner, 76 T.C. 441, 444 (1981), the Ninth Circuit stated:  "The term 'derive' requires 'a nexus between the income received and a trade or business that is, or was, actually carried on.'"  Milligan v. Commissioner, supra at 1098.  The Ninth Circuit continued:

> By nexus, we mean that the "trade or business activity
> by the taxpayer gives rise to the income...."  Id.
> [Newberry v. Commissioner, supra] (emphasis added).
> The income is sufficiently related to the taxpayer's

> trade or business activity when the business <u>activity</u> is its source. <u>Id.</u> at 446 ("Any income <u>must arise from</u> some actual ... <u>income-producing activity</u> of the taxpayer before such income becomes subject to ... self-employment taxes...."). [<u>Id.</u>]

The Ninth Circuit found it unnecessary to characterize the precise relationship between the termination payments and the taxpayer's prior business activity because it was obvious to the court that the termination payments did not "'derive' from Milligan's prior business activity within the meaning of the self-employment tax." <u>Id.</u> The Ninth Circuit laid down the following general rule: "To be taxable as self-employment income, earnings must be tied to the quantity or quality of the taxpayer's prior labor, rather than the mere fact that the taxpayer worked or works for the payor." <u>Id.</u>

Because Milligan already had been fully compensated for his services, the Ninth Circuit concluded that the termination payments were linked only to Milligan's previous status as a 2-year plus independent contractor for State Farm, and, thus, "none of his business activity was the 'source' of the Termination Payments." <u>Id.</u> at 1098-1099. The Ninth Circuit supported its holding that previous independent contractor status alone was not a sufficient nexus by analogizing to a wage tax situation in which employer-provided supplemental unemployment benefits were held not to be wages because the benefits, although the result of employment status at some previous time, were "'[I]n no way * * * a function of the employee's <u>providing</u>

<u>services</u> for his employer.  Those benefits are not derived from any employment carried on.'"  <u>Id.</u> at 1099 (quoting <u>Newberry v. Commissioner</u>, 76 T.C. at 445).

I dissent because I am not persuaded by the reasoning of the Ninth Circuit in <u>Milligan v. Commissioner</u>, <u>supra</u>.  I do not agree with the quantity-or-quality-of-labor test adopted by the Ninth Circuit.  I believe that the Ninth Circuit has overemphasized parallels between the wage tax acts (the Federal Insurance Contributions Act (FICA) and the Federal Unemployment Tax Act (FUTA)) and SECA, forgetting that SECA, unlike FICA and FUTA, does not impose a levy solely against labor, but, rather, imposes a levy against certain trade or business income of an individual.  Compare sections 3121(a) and 3306(b) with section 1402(a).  Properly, the Ninth Circuit looks for a connection (nexus) between the gross income in question and the taxpayer's business "activity".  Improperly, however, the Ninth Circuit uses the word "activity" in a limited sense, a sense that encompasses only physical or mental exertions:  e.g., "Because Milligan already had been fully compensated for his services, none of his business <u>activity</u> was the 'source' of the Termination Payments."  <u>Milligan v. Commissioner</u>, <u>supra</u> at 1099 (emphasis added).  Such a restrictive interpretation may be appropriate for a wage tax analysis, in which the question is whether the payment is remuneration for employment (labor), see sections 3121(a), 3306(b), but it is too narrow a frame of reference to determine

whether the taxpayer's trade or business is the source of an item of gross income.

The statutory phrase in question is "net earnings from self-employment", which is defined in section 1402(a) as "gross income derived by an individual from any trade or business carried on by such individual [less certain deductions]". The only term that suggests that less than all of the trade or business income of an individual is subject to tax is the term "carried on". S. Rept. 1669, 81st Cong., 2d Sess. (1950), 1950-2 C.B. 302, is the report of the Committee on Finance that accompanied H.R. 6000, which was enacted as the Social Security Act Amendments of 1950, ch. 809, 64 Stat. 477, which included the Self-Employment Contributions Act. That report indicates that Congress used the verbal phrase "carried on" in a relational sense, to describe a business conducted or operated <u>by</u> the individual subject to the tax (as opposed to someone else):

> The trade or business must be "carried on" by the individual either personally or through agents or employees, in order for the income to be included in his "net earnings from self-employment." Accordingly, gross income derived by an individual from a trade or business carried on by him does not include income derived by a beneficiary from an estate or trust even though such income is derived from a trade or business carried on by the estate or trust. [S. Rept. 1669, <u>supra</u>, 1950-2 C.B. at 354.]

See also H. Rept. 1300, 81st Cong., 1st Sess. (1949), 1950-2 C.B. 255, 294.

Clearly, the trade or business need not <u>currently</u> be carried on by the individual; a <u>past</u> carrying on will do. See <u>Schumaker</u>

v. Commissioner, 648 F.2d 1198, 1200 (9th Cir. 1981) (affirming self-employment tax on sale proceeds from wheat that the taxpayer grew in the past: "[S]elf-employment income is determined by the source of the income, not the taxpayer's status at the time the income is realized." (emphasis added)), affg. in part and revg. in part T.C. Memo. 1979-71; sec. 1.1402(a)-1(c), Income Tax Regs.

Thus, the only relevant question is whether the item of gross income in question is derived from the taxpayer's trade or business or from some other source. It seems safe to conclude that petitioner was in the business of selling insurance as an independent agent of State Farm Insurance Co. (State Farm). His relationship with State Farm, including the terms under which he would earn gross income from State Farm, were governed by his written agency agreements with State Farm. The termination payments were made pursuant to the State Farm Agent's Agreement, Form AA3 (the Agreement). The Agreement appoints petitioner an agent of State Farm for an indefinite period. The Agreement contains a preamble and six numbered sections:

    (1)  Mutual Conditions and Duties
    (2)  Compensation
    (3)  Termination of Agreement
    (4)  Termination Payments
    (5)  Extended Termination Payments
    (6)  General Provisions

The section entitled "Termination of Agreement" provides, in pertinent part, that the Agreement terminates upon the agent's death or upon written notice by either party. That section also contains a prohibition against competition by the terminated

agent.  Termination payments are provided for in the section entitled "Termination Payments" and are as described by the majority.  The Agreement provides that it is the sole and entire agreement between the parties.  No part of the agreement has to do with anything other than the beginning, middle, and end of petitioner's business relationship with State Farm.

The termination payments were conditioned on petitioner's returning to State Farm all of its property and not competing with State Farm for 1 year, and those payments were a product of both petitioner's performance during his last year with State Farm and the staying power of petitioner's performance for State Farm.  The payments were not otherwise identified as being in consideration for any particular contractual obligation of petitioner's under the Agreement.  Some portion of the termination payments may have been in consideration for petitioner's promise not to compete for 1 year.  The majority's report does not contain sufficient information from which to make an allocation.  Moreover, I am not convinced that, even if such information were available, an allocation would be required.  In Barrett v. Commissioner, 58 T.C. 284, 289 (1972) (rejected sub silentio with respect to its focus on the "goods-and-services test" in Groetzinger v. Commissioner, 82 T.C. 793 (1984), affd. 771 F.2d 269 (7th Cir. 1985), affd. 480 U.S. 23 (1987)), we accepted the parties' agreement "that noncompetition does not constitute the carrying on of a trade or business."  In addition,

in <u>Ohio Farm Bureau Fedn., Inc. v. Commissioner</u>, 106 T.C. 222, 236 (1996), we suggested that the rationale in <u>Newberry v. Commissioner</u>, 76 T.C. 441 (1981), supported the holding that income from a nonsponsorship and noncompetition agreement does not constitute "unrelated business income" under the definition of that term in section 512(a). Those cases, however, do not mandate the conclusion that income received from a covenant not to compete is <u>per se</u> excluded from the reach of SECA. I think that the law on that point still may be uncertain. Since that point is not crucial to my disagreement with the Ninth Circuit, I shall not pursue it any further. It is sufficient to me that, on the facts as I understand them, the payments were made pursuant to a business contract that served no purpose other than to define both the consideration for and other aspects of the business relationship between petitioner and State Farm.

Lastly, the termination payments in this case are fundamentally unlike the insurance proceeds in <u>Newberry v. Commissioner</u>, <u>supra</u>. The payments in <u>Newberry</u> were derived from an insurance policy that was purchased by the taxpayer in order to provide him with a <u>substitute</u> for his trade or business income in the event of a business interruption, such as the catastrophic fire in that case. The payments took the place of income from the trade or business and were not themselves income from that business. In this case, the termination payments were derived from a trade or business carried on by petitioner.