110 T.C. No. 31

UNITED STATES TAX COURT

FREDRICK J. AND RUTH WUEBKER, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 11472-96.                    Filed June 23, 1998.

P executed a contract enrolling his farmland for
10 years in the Conservation Reserve Program.  Food
Security Act of 1985, Pub. L. 99-198, 99 Stat. 1509-
1514, current version at 16 U.S.C. secs. 3831-3836
(1994).  P agreed to remove the farmland from
production and was required to establish vegetative
cover on such land during the first year of the
contract.  P was required to maintain established
conservation practices throughout the term of the
contract, and, in return, P received annual rental
payments.

Held:  Annual payments received by P under the
contract were rentals from real estate and therefore
not subject to self-employment tax under secs. 1401 and
1402, I.R.C.

Paul L. Wright, for petitioners.

Stephen J. Neubeck, for respondent.

GERBER, Judge:  This case was heard by Special Trial Judge Stanley J. Goldberg, pursuant to the provisions of section 7443A(b)(3) and Rules 180, 181, and 182.[1]  The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below.

## OPINION OF THE SPECIAL TRIAL JUDGE

GOLDBERG, Special Trial Judge:  Respondent determined deficiencies in petitioners' Federal income taxes for 1992 and 1993 in the respective amounts of $1,685 and $1,640.  The issue for decision is whether petitioners are liable for self-employment taxes on payments received under the U.S. Department of Agriculture (USDA) Conservation Reserve Program (CRP).

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference.  Petitioners resided in Fort Recovery, Ohio, at the time that they filed their petition.

---

[1]  Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Prior to the years in issue, Fredrick J. Wuebker (petitioner) had been farming for approximately 20 years. Petitioners were joint owners of 258.67 acres of land, including approximately 214 acres of tillable land. The remaining acreage was made up of woods, waterways, and land containing improvements. Petitioners' property contained hilly land, prone to erosion, on which petitioner had grown various crops including corn, soybeans, and wheat prior to the years in issue. In addition, petitioner raised laying hens on petitioners' land as part of his farming operations.

In 1991, petitioners offered their tillable land for enrollment in the CRP. Petitioners believed that participation in the CRP program would be beneficial for their land and that it would increase the productivity of petitioner's poultry operation by allowing him to devote more time and efforts thereto.

A CRP contract was executed on behalf of the Commodity Credit Corporation (CCC) in November 1991. The CRP contract is a form contract. The CRP contract covered approximately 214 acres of petitioners' farm (the CRP land). Under the CRP contract, in order to qualify for the program, the land must "Have been annually planted or considered planted to an agricultural commodity in 2 of the 5 crop years, from 1986 to 1990", and it must be able to be planted to an agricultural commodity and be predominantly highly erodible.

Only an owner or operator or tenant of eligible cropland may enter into a CRP contract. The CRP contract provides that to qualify for the program, an operator must provide evidence that he will remain in control of such cropland for the duration of the CRP contract. The CRP contract listed the operator of the land as Fred Wuebker, and provided that he was to receive 100 percent of the payments thereunder. The CRP contract listed the owner of the land as Ruth Wuebker (Mrs. Wuebker).

Petitioner agreed to place the CRP land into the program for 10 crop years; to implement the conservation plan which is part of the contract; to establish and maintain vegetative cover; not to engage in or allow grazing, harvesting, or other commercial use of the crop from the CRP land; and to control weeds, insects, and pests on the CRP land. The conservation plan, which was incorporated into the CRP contract, included seeding recommendations for the CRP land and provided an estimated cost-share for the plan. The plan provided that once the conservation practices described in the conservation plan had been established, petitioner was required to maintain such practices at no cost to the Government.

Under the CRP contract, the CCC agreed to make "annual rental payments" to petitioner. The rental rate was set at $85 per acre enrolled in the program. The CCC further agreed to

share the cost with petitioner of establishing the conservation plan.

According to the terms of the CRP contract, the representatives of the CCC had the right of access to the CRP land and the right to examine petitioner's records or other lands for the purpose of determining whether petitioner was complying with the terms and conditions of the CRP contract. Finally, the CRP contract incorporated the regulations in 7 C.F.R. sec. 1410 (1997) for the CRP and stated that in the event of conflict, the regulations would prevail.

The CRP program was administered by the CCC and the Agricultural Stabilization Conservation Service during the years in issue.

In 1992, the first year of the CRP contract term, petitioner disked the CRP land and planted seed to establish ground cover. In doing so, petitioner used the same equipment he had used previously in farming the CRP land. In subsequent years, petitioner performed minimal, if any, upkeep on the CRP land.

During the years in issue, petitioner worked a farm, under a sharecrop arrangement, on a separate piece of land north of petitioners' farm, and he continued to raise laying hens on their farmland contiguous with the CRP land. Petitioner did not grow any crops on petitioners' farmland during the years in issue. In

1991 petitioners owned approximately 40,000 laying hens.  By 1997 this number had increased to approximately 57,000.

Petitioner received CRP payments in the amount of $18,190 in 1992.  In the same year petitioner received cost-share payments for establishing ground cover on the CRP land.[2]  In 1993, he received CRP payments totaling $18,267.

In 1992, Mrs. Wuebker began attending college, and, in 1993, she was employed part-time.

On Schedule E of the returns for 1992 and 1993, petitioners reported rents received on the CRP land, less mortgage interest and taxes,[3] as farm rental income not subject to self-employment taxes.  For 1992, petitioners included the cost-share payments received with respect to the CRP land on Schedule F, Profit or Loss From Farming.[4]  Petitioners paid self-employment taxes with respect to petitioner's reported net profit from farming.

In the notice of deficiency, respondent determined that the amounts received by petitioner under the CRP contract, less the

---

[2]    On the record, the amount of such payments is not clear.

[3]    In 1992, petitioners did not claim a deduction for taxes on Schedule E.

[4]    The parties stipulated that petitioners reported the CRP contract payments and related expenses on Schedule E for the taxable years 1992 and 1993.  To the extent that this stipulation is contrary to the facts revealed on the record, we are not bound by it.  Cal-Maine Foods, Inc. v. Commissioner, 93 T.C. 181, 195 (1989).

deductions attributable thereto,[5] constituted income from self-employment. Respondent accordingly determined deficiencies in petitioners' self-employment tax for the years in issue. Respondent allowed petitioners additional deductions with respect to the self-employment tax liability. In addition, as a computational result of the adjustments, respondent decreased the amount of the general business credits and earned income credits allowed to petitioners for the years in issue.

OPINION

Section 1401 imposes a tax on the self-employment income of every individual. Self-employment income is defined as "net earnings from self-employment". Sec. 1402(b). The term "net earnings from self-employment" is defined as gross income derived by an individual from a trade or business carried on by such individual less the deductions attributable thereto. Sec. 1402(a).

In order to be subject to the self-employment tax, income must be derived from a trade or business carried on by an individual. Jackson v. Commissioner, 108 T.C. 130, 134 (1997); Newberry v. Commissioner, 76 T.C. 441, 444 (1981). There must be a nexus between the income received and a trade or business that

_____

[5] Respondent disallowed $102 of the mortgage interest deduction claimed by petitioners in 1992. Petitioners did not contest this adjustment at trial or on brief. Petitioners are deemed to have conceded this issue.

is, or was, actually carried on by the individual.  Newberry v.

Commissioner, supra.  Under this Court's interpretation of the

"nexus" standard, income must arise from some income-producing

activity of the taxpayer before such income is subject to self-

employment tax.  Jackson v. Commissioner, supra.

Generally, net earnings from self-employment do not include

rentals from real estate and the deductions attributable thereto.

Sec. 1402(a)(1); sec. 1.1402(a)-4(d), Income Tax Regs.  An

exception to the exclusion exists under sec. 1402(a)(1)(A) and

(B) for certain arrangements with respect to the production of

agricultural or horticultural commodities.[6]  Respondent does not

contend that the exception to the exclusion applies in these

circumstances, nor do we think that it applies.  Simply put,

---

[6]    Sec. 1402(a)(1) provides that the exclusion shall not apply:

> to any income derived by the owner or tenant of land if (A)
> such income is derived under an arrangement, between the
> owner or tenant and another individual, which provides that
> such other individual shall produce agricultural or
> horticultural commodities (including livestock, bees,
> poultry, and fur-bearing animals and wildlife) on such land,
> and that there shall be material participation by the owner
> or tenant * * * in the production or the management of the
> production of such agricultural or horticultural
> commodities, and (B) there is material participation by the
> owner or tenant * * * with respect to such agricultural or
> horticultural commodity;

The arrangement must impose an obligation to produce one or more
agricultural or horticultural commodities.  Sec. 1.1402(a)-
4(b)(3), Income Tax Regs.

there was no agreement to produce or actual production of agricultural or horticultural commodities on the CRP land.

In determining whether compensation is includable in self-employment income, sections 1401 and 1402 are to be construed broadly so as to favor coverage for Social Security purposes. Braddock v. Commissioner, 95 T.C. 639, 644 (1990). In order to achieve this end, the rental exclusion is narrowly construed. Johnson v. Commissioner, 60 T.C. 829, 833 (1973). In Delno v. Celebrezze, 347 F.2d 159, 163 (9th Cir. 1965), the court considered the parallel provision of the Social Security Act, ch. 531, tit. II, sec. 211 (1935), 42 U.S.C. sec. 411(a)(1994), as added by Social Security Act Amendments of 1950, ch. 809, tit. I, sec. 104(a), 64 Stat. 502, and stated:

> The apparent intent of Congress was that section 211(a)(1)[42 U.S.C. sec. 411(a)] should be applied to exclude only payments for use of space, and, by implication, such services as are required to maintain the space in condition for occupancy. If the owner performs additional services of such substantial nature that compensation for them can be said to constitute a material part of the payment made by the tenant, the "rent" received then consists in part of income attributable to the performance of labor which is not incidental to the realization of return from passive investment. In such circumstances, the entire payment is to be included in computing the recipient's "net earnings from self-employment."

Rent is ordinarily defined as compensation for the occupancy or use of property. See Black's Law Dictionary 1297 (6th ed. 1990); see also sec. 1.61-8(a), Income Tax Regs.

Under the CRP, the Secretary of Agriculture is authorized to enter into long-term contracts with owners or operators of farmlands to convert highly erodible croplands to soil-conserving uses. See 16 U.S.C. sec. 3831 (1994), added by the Food Security Act of 1985, Pub. L. 99-198, sec. 1231, 99 Stat. 1509, amended by the Food, Agriculture, Conservation, and Trade Act of 1990, Pub. L. 101-624, sec. 1932(2), 104 Stat. 3577. Title 16 U.S.C. section 3833 provides that in return for the contract entered into by an owner or operator of land, the Secretary of Agriculture will make "annual rental payments" in the amount necessary to compensate for "the conversion of highly erodible cropland normally devoted to the production of an agricultural commodity on a farm or ranch to a less intensive use". 16 U.S.C. sec. 3833(2)(A).

Petitioners argue that the CRP payments they received were rent as the term is ordinarily defined. Petitioners point out the CRP authorizing statute and the CRP contract use of the word "rental". Petitioners contend that Congress intended for the payments to be excluded from self-employment income because Congress is presumed to have known that rental income is excluded from self-employment income.

Respondent counters that the payments received were not rentals from real estate. We agree with petitioners.

The statute, the regulations, and the CRP contract identify the payments as rental payments or rent. The CRP statute and regulations repeatedly and consistently refer to the annual payments as rent or rentals. See 16 U.S.C. secs. 3833(2), 3834(a), (c); 7 C.F.R. secs. 1401.3, 1410.101 (1998). Generally in construing the meaning of a statute, we give the language its plain meaning, assuming that Congress uses common words in their popular meaning and relying on the words as generally understood. Norfolk S. Corp v. Commissioner, 104 T.C. 13, 36-37, modified 104 T.C. 417 (1995), affd. 104 F.3d 240 (4th Cir. 1998).

The primary purpose of the CRP is to achieve specified environmental benefits, in particular, reducing soil erosion by removing land from production. See S. Rept. 101-357, at 199-200 (1990); H. Rept. 99-271(I) at 81 (1985). In determining the acceptability of bids, the Secretary of Agriculture may consider the extent to which the enrollment of land would improve the soil resources, water quality, or wildlife habitat or provide other environmental benefits. 16 U.S.C. sec. 3834(c)(3). Consistent with these goals, under the CRP contract petitioner was prohibited from harvesting the CRP land and was required to implement a conservation plan. Beyond establishing vegetative ground cover in the first year of the contract, for which

petitioner received a cost-share payment,[7] petitioner was obligated to perform minimal services in connection with the CRP land.

In imposing the above-described restrictions on the use of the land, the primary purpose of the CRP contract was to effectuate the statutory intention of converting highly erodible croplands to soil conserving uses. The services that petitioner was required to perform over the contract term included maintaining the vegetative cover, controlling weeds, insects, and pests on the land, and fulfilling certain reporting requirements. These service obligations were not substantial and were incidental to the primary purpose of the contract. Thus, the CRP payments represented compensation for the use restrictions on the land, rather than remuneration for petitioner's labor. Our conclusion is consistent with and supported by the language used by Congress in the CRP statute, which describes the payments as rentals. Therefore, the payments are excluded from petitioner's earnings from self-employment as rentals from real estate within the meaning of section 1402(a)(1).[8]

---

[7]    The cost-share rate was 50 percent. Food Security Act of 1985, Pub. L. 99-198, sec. 1234, 99 Stat. 1511, 16 U.S.C. sec. 3834(b)(1)(1994).

[8]    Respondent points out that the legislative history of the Food Security Act of 1985 indicates that in addition to the environmental benefits, a successful conservation reserve would "curb production of surplus commodities" and "provide some needed
(continued...)

Respondent argues that petitioner was actively engaged in farming and that the CRP payments had a direct nexus with that operation.  Respondent contends that the CRP program was inextricably intertwined with petitioner's trade or business of farming.

> Section 1.1402(a)-4(d), Income Tax Regs., provides:
>
> Except in the case of a real-estate dealer, where an individual or a partnership is engaged in a trade or business the income of which is classifiable in part as rentals from real estate, only that portion of such income which is not classifiable as rentals from real estate, and the expenses attributable to such portion, are included in determining net earnings from self-employment.

Thus, because we have determined that the payments qualify as rentals from real estate under section 1402(a)(1), even if such payments were derived from petitioner's farming operations, the payments would not be includable in petitioner's earnings from self-employment.

Respondent argues that this case is indistinguishable from Ray v. Commissioner, T.C. Memo. 1996-436.  In Ray, the taxpayer, who owned land he used for farming and/or cattle grazing, purchased an additional tract of land which had been enrolled in the CRP program by the prior owner.  The taxpayer executed an agreement to continue the CRP contract.  The taxpayer did not

---

[8](...continued)
income support for farmers".  H. Rept. 99-271(I) at 81 (1985), 1985 U.S.C.C.A.N. 1185.  We do not think that these concurrent goals change the primary character of the payments received.

farm the property, but he applied herbicide and shredded natural grasses to the property.  After considering the provisions of Rev. Rul. 60-32, 1960-1 C.B. 23, the Court found that the taxpayer was an "active farmer/rancher" with respect to other acreage.  The Court regarded the payments as having a direct nexus to his trade or business of farming, and, on this basis, the Court held that the payments were subject to self-employment taxes.  In Ray v. Commissioner, supra, the Court did not address whether the payments qualified under the rental exclusion provisions of section 1402(a)(1).  In contrast, because we have found that the CRP payments herein are rentals, such payments are not subject to self-employment taxes even if a nexus exists between the CRP payments and petitioner's farming trade or business.

In Rev. Rul. 60-32, supra, the Internal Revenue Service (IRS) ruled that certain payments received under the Soil Bank Act, title I of the Agricultural Act of 1956, ch. 327, 70 Stat. 188 (formerly 7 U.S.C. 1801), were includable in gross income and concluded that such payments were "in the nature of receipts from farm operations in that they replace income which producers could have expected to realize from the normal use of the land devoted to the program."  Rev. Rul. 60-32, 1960-1 C.B. at 25.  Without any further analysis, the IRS ruled that the payments and

benefits are includable in determining the recipient's net earnings from self-employment.

In our view, Rev. Rul. 60-32, supra, is not persuasive in these circumstances. The IRS did not address whether the payments constituted rentals.

The CRP payments received by petitioner during the years in issue were rentals from real estate and not self-employment earnings.

We have considered all of the arguments presented by the parties, and, to the extent not discussed above, they are without merit or not relevant.

To reflect the foregoing,

Decision will be entered
under Rule 155.