MAYER, Circuit Judge.
 

 Herbert J. Gump and Marilyn Gump appeal a judgment entered by the Court of Federal Claims after denying their motion for summary judgment and granting the government’s cross-motion.
 
 *
 
 The Court of Federal Claims held that Gump’s monthly payments from the insurance company from which he retired were derived from his activities as an insurance sales agent and thus represented self-employment income. We reverse.
 

 Background
 

 Gump was an insurance agent with Nationwide Mutual Insurance Co. (“Nationwide”) for over 35 years. He operated as an independent contractor under the name “Gump Insurance Agency” until he retired on December 31, 1989. Under Nationwide’s Agency Security Compensation Plan, an agent who retires after at least five years is potentially entitled to two forms of additional payment: Deferred Compensation Incentive Credits (DCIC) and extended earnings. The DCIC amount represents compensation that the agent earned throughout the course of his affiliation with Nationwide, which Nationwide annually credited to his retirement account. The extended earnings are an amount calculated by reference to the agent’s policy renewal fees for his last twelve months of service, subject to certain adjustments. The extended earnings are financed by decreasing the renewal commission rates of the agent who takes over the files of the departing agent by fifty percent for two years.
 

 Gump met the requirements in the agreement and received $116,805.86 in DCIC and $101,267.06 in extended earnings in monthly installments of $3,750.85 over five years. In 1990 and 1991, the tax years in question, Gump reported both amounts as self-employment income.
 

 On June 29, 1992, Gump requested a refund of self-employment taxes on the extended earnings portion of his monthly payments in the amount of $5,464.00 for 1990 and $5,095.00 for 1991. The IRS disallowed these claims on November 27, 1992, and Gump filed a refund suit on March 24, 1993. On March 9, 1995, the Court of Federal Claims granted the government’s cross-motion for summary judgment.
 

 Discussion
 

 No relevant facts are in dispute. The sole issue is whether the Court of Federal Claims erred in holding that the extended earnings paid by Nationwide to Gump after his retirement are “derived from a trade or business carried on by him” within the meaning of the Self-Employment Contributions Act and thus are taxable as self-employment income. We review the summary judgment of the Court of Federal Claims, as well as its interpretation and application of the governing law,
 
 de novo. Lane Bryant, Inc. v. United States,
 
 35 F.3d 1570, 1574 (Fed.Cir.1994).
 

 Self-employment income is taxed “in order to fund social security benefits for self-employed individuals.”
 
 Patterson v. Commissioner,
 
 740 F.2d 927, 929 (11th Cir.1984). “[N]et earnings from self-employment derived by an individual ... during any taxable year” constitute “self-employment income.” 26 U.S.C. § 1402(b) (1994). The Internal Revenue Code defines “net earnings from self-employment” as “gross income derived by an individual from any trade or business carried on by such individual,” less allowable deductions.
 
 Id.
 
 § 1402(a);
 
 see also
 
 26 C.F.R. § 1.1402(a)-l(a) (1996) (defining “net
 
 *1128
 
 earnings from self-employment”). Self-employment income need not be earned in a year in which the taxpayer is subject to self-employment tax; under the applicable regulations, “[gjross income derived by an individual from a trade or business includes gross income received ... or accrued ... in the taxable year from a trade or business even though such income may be attributable in whole or in part to services rendered or other acts performed in a prior taxable year as to which the individual was not subject to the tax on self-employment income.”
 
 Id.
 
 § 1.1402(a) — 1(c).
 

 The Court of Federal Claims held that the extended earnings are necessarily derived from Gump’s insurance business because they “represent a right to compensation established by the terms of the business relationship formalized in the Agent’s Agreement.” Slip Op. at 5-6, 1995 WL 864085. The court reasoned that the extended earnings are “part and parcel of the consideration promised by the company in return for the exclusive sales representation undertaken by the agent.”
 
 Id.
 
 at 5. Having the same focus on overall “business relationship” as the trial court, the government argues that Gump’s extended earnings are self-employment income because they are an “integral part of the overall relationship” between Gump and Nationwide and therefore must be seen as “part of the compensation paid to an insurance agent for selling Nationwide insurance.”
 

 We disagree. Rather than reasoning that the right to receive these funds arises from “the business arrangement,” it is more accurate to say that the right to receive them arises from the qualified cancellation of that arrangement.
 
 Cf Milligan v. Commissioner,
 
 38 F.3d 1094, 1098 n. 6 (9th Cir.1994) (“Payments derived from the cessation of [the taxpayer’s business are not subject to self-employment tax.”). No right to extended earnings arises absent a qualified cancellation of the agreement. Thus, qualified cancellation is not just a condition that must be observed to preserve Gump’s eligibility for these earnings; it is a precondition to receiving them. He would not have received these earnings at all if he had “induced or attempted to induce, either directly or indirectly, policyholders to lapse, cancel, or replace any insurance contract in force” with Nationwide, which would have made the cancellation “unqualified.” Thus, it is improper to ignore the very conditions that give rise to the extended earnings and look only at the “big picture”— i.e., that all of the earnings are in a sense rooted in the Agent’s Agreement.
 
 Cf. Newberry v. Commissioner, 76
 
 T.C. 441, 446, 1981 WL 11375 (1981) (holding that insurance proceeds derived from the taxpayer’s inability to operate his grocery store were not taxable as self-employment income). Whether or not the extended earnings are payable to Gump in some sense as “compensation” for “services rendered under this Agreement,” they are not “part and parcel of the consideration promised by the company in return for the exclusive sales representation undertaken by the agent,” Slip Op. at 5. Undertaking the exclusive sales representation does not give rise to an automatic right to receive the extended earnings.
 

 Because the DCIC earnings are subject to the same conditions as the extended earnings — that Gump refrain from selling insurance for one year within 25 miles of his former office, and that he return all company records and supplies in good condition within ten days — the government argues that “[t]he far better reading is that Extended Earnings are a deferred compensation benefit.” The character of the DCIC earnings is not before us, because the taxpayers concede that they are deferred compensation and as such are subject to self-employment tax. We cannot agree, however, that the extended earnings are equivalent to deferred compensation, because Gump was previously paid all renewal commissions to which he was entitled under paragraph 7 of the Agent’s Agreement.
 

 There are, moreover, significant differences between the two types of payment. First, unlike the DCIC earnings, the extended earnings are not derived by holding back a portion of Gump’s salary — they are paid in essence by his replacement. Second, the extended earnings, unlike the DCIC payments, were subject to adjustments unrelated to Gump’s business activities. Nationwide could make deductions from the payments if certain large commercial policies were can-
 
 *1129
 
 celled in the year following his last year of service. This adjustment in the amount he would receive is unrelated to the actual quantity or quality of his labor.
 
 Cf. Milligan,
 
 38 F.3d at 1099 (adjustments made by State Farm to the amount of Milligan’s Termination Payments meant that “[t]he adjusted payment amount depended
 
 not
 
 upon Milli-gan’s past business activity, but upon the successor agent’s future business efforts to retain Milligan’s customers and to generate service compensation for State Farm”). In any case, there is no incongruity in differentiating between the two types of payments despite the similar conditions on their receipt.
 
 See, e.g., Darden v. Nationwide Mut. Ins. Co.,
 
 922 F.2d 203, 208 (4th Cir.1991) (DCIC plan was a pension plan subject to ERISA but the extended earnings were not a pension plan but rather were “in the nature of a buy-out in which the departing agent receives payments based on what he leaves behind in the way of business for his successor”),
 
 rev’d on other grounds,
 
 503 U.S. 318, 112 S.Ct. 1344,117 L.Ed.2d 581 (1992).
 

 The Ninth Circuit has reached a result consistent with ours in a very similar case,
 
 Milligan v. Commissioner,
 
 38 F.3d 1094 (9th Cir.1994). Like Gump, Milligan was an insurance agent working as an independent contractor, in Milligan’s case for State Farm Insurance Company. He terminated his agreement with State Farm more than two years after its effective date, which made him eligible for five years of monthly “Termination Payments.”
 
 Id.
 
 at 1096. As is the case with Nationwide’s extended earnings, “[n]o portion of [Milligan’s] compensation was ever deferred to create” the termination payments.
 
 Id.
 
 The termination payments were computed in the first year based on a percentage of the income he generated during his final year of employment, less deductions for cancelled policies. In the next four years, the company would pay him a fraction of the amount payable in the first year. Like Gump, Milligan had no vested right to receive any of these payments; rather, they were conditioned on two contractual requirements: (1) to return State Farm’s property within ten days of termination; and (2) to refrain from competing with all of the State Farm companies for one year. The termination payments were adjusted to reflect the amount of income State Farm received on his book of business during the first post-termination year and the number of his personally produced policies cancelled during that year.
 

 The Tax Court upheld the Commissioner’s deficiency determination, reasoning that the termination payments were deferred compensation that State Farm offered to induce agents to enter into the agreement, and as such they “derived” from his insurance sales business. The Ninth Circuit reversed, holding that, “[t]o be taxable as self-employment income, earnings must be tied to the quantity or quality of the taxpayer’s prior labor, rather than the mere fact that the taxpayer worked or works for the payor.”
 
 Id.
 
 at 1097. We are not bound by this decision, of course, but we find the reasoning persuasive, and we do not see any meaningful differences between Milligan and Gump that would counsel a different result.
 
 See, e.g., In re Wickline,
 
 796 F.2d 1055, 1059 (8th Cir.1986);
 
 see also Western Nat’l Life Ins. Co. v. Commissioner,
 
 432 F.2d 298, 301 (5th Cir.1970) (“While, of course, we are not bound by the decisions of the Courts of Appeals of the two circuits which have heretofore passed upon precisely this same question, we think it appropriate to say that it would take extremely cogent reasoning to cause us to take a different view on a matter of statutory construction.”).
 

 Using the
 
 Milligan
 
 court’s phraseology, the government argues that Gump’s earnings are “tied to the quantity or quality” of his labor because the amount that he can receive “is tied directly to the level of renewal commissions generated by the agent in his final year of service.” However, the renewal commissions generated in Gump’s last year determine the amount of the extended earnings payment, subject to adjustment, not the right to it. The only significance that can properly be attached to this amount is that it was used as a benchmark to determine how much he would receive if he complied with the agreement. Indeed, as the
 
 amici
 
 point out, “[t]he rule of thumb for valuation of insurance agencies is for the purchasing agent to pay the terminating agent between one and three times the amount of the agency’s trailing year’s gross production. This is a convenient
 
 *1130
 
 benchmark because it automatically takes into account all of the competitive factors existing during the most recent relevant time period and it is an attractive method because an undefined negotiable sale is ... complicated and can result in erosion of the goodwill which is so valuable to the agency.”
 

 Thus, the extended earnings are not unpaid renewal commissions, they are computed by reference to renewal commissions — a reasonable indicator of the value of Gump’s insurance business at the time he relinquished control of it. That amount is unaffected by his income during any prior period, by the total number of policies written over his career, by the total time period he served as an agent, or even by the length of his service to Nationwide. In other words, the amount is not “tied to the quantity or quality” of his labor in any meaningful way.
 

 Relatedly, the government attaches significance to the fact that if Gump had “lost all of his customers during 1989, he would have been entitled to no Extended Earnings.” The logic of the argument compels the opposite conclusion. Had he lost all of his customers but complied with the rest of the agreement, he still would have been entitled to extended earnings but they would have had no value under the chosen contractual benchmark. Had he failed to comply with the contractual requirements — for example, by failing to return Nationwide’s supplies or by competing with Nationwide within 25 miles of his previous office location within one year — he would not have been entitled to any extended earnings, no matter how many commissions he generated in his last year. Thus, it is incorrect that the source of the right to the extended earnings is “that part of the agreement setting forth Nationwide’s promise to pay Extended Earnings to Mr. Gump in return for his success in obtaining renewal commissions in the final year of his service.” Slip Op. at 4-5.
 

 Because the payments are not “derived” from his insurance business, we need not determine the precise nature of the payments or specifically characterize them as a particular type of income. That is, we need not determine whether they represent consideration for an agreement not to compete or the purchase of his insurance franchise, including its assets and goodwill. It suffices to hold, as we do, that they are not derived from a trade or business carried on by Gump and thus they are not taxable as self-employment income.
 

 Conclusion
 

 Accordingly, the judgment of the United States Court of Federal Claims is reversed.
 

 REVERSED.
 

 *
 

 Although Herbert and Marilyn Gump are both plaintiffs-appellants because they filed joint federal income tax returns, Herbert Gump’s business activities are the subject of the remainder of this opinion.