ROSENBAUM, Circuit Judge,
dissenting in part and concurring in the judgment in part:
To be taxable as self-employment income, an individual’s income must be (1) derived, (2) from a trade or business, (3) carried on by that individual. See 26 U.S.C. § 1402(a)-(b). Here the parties agree that the payments Christine Peterson received under Mary Kay’s Family Security Program and Great Futures Program (collectively, the “Programs”) are related in some way to the Mary Kay business formerly carried on by Peterson. The only issue is whether the payments “derive” from that business.
The Majority holds that they do based on the “Danielson rule.” Maj. Op. at pp. 986-89. That judge-made rule permits the Commissioner of the Internal Revenue Service to bind a taxpayer to her initial characterization of the form of a transaction. See generally Comm’r v. Danielson, 378 F.2d 771 (3d Cir. 1967) (en banc); see also Plante v. Comm’r, 168 F.3d 1279, 1280 (11th Cir. 1999). The Majority asserts that, by operation of the agreements Peterson executed to enroll in the Programs, she consented to Mary Kay’s characterization of Program payments as “deferred compensation.” According to the Majority, she is therefore prohibited from challenging that characterization by the Danielson rule. Because it is well-established that “deferred compensation” derives from a taxpayer’s prior labor and is subject to the self-employment tax, the Majority concludes that[1] Peterson must pay the self-employment tax on the program payments.
Peterson, however, never characterized the payments as deferred compensation. Instead, the agreements Peterson executed to enter Mary Kay’s programs empowered Mary Kay to make unilateral amendments to the Programs. Years after Peterson and Mary Kay entered into the agreements, Mary Kay invoked that pow-pr to unilaterally characterize payments made under the Programs as “deferred compensation.” The Danielson rule has never been applied on facts like these. Nor should it be. Accordingly, I cannot agree with the Majority opinion’s application of the Danielson rule here and respectfully dissent from that portion of the opinion.
Because I would hold that the Danielson rule is inapplicable here, I would apply the well-established Newberry test to determine whether there is a “nexus” between the payments Peterson received under the Programs and her Mary Kay business. Newberry v. Comm’r, 76 T.C. 441, 444 (1981). Such a nexus exists between the Family Security. Program payments and Peterson’s work as a Mary Kay National Sales Director, so I concur in the Majority’s judgment holding that the self-employment tax is applicable to these payments. On the other hand, there is no such nexus between the payments made under the Great Futures Program and Peterson’s Mary Kay labor, so I would hold that the self-employment tax is inapplicable to those payments, and I therefore respectfully dissent from the Majority’s judgment to the contrary.
I.
The parties agree that if the payments made to Peterson pursuant to the Family Security Program (“Family Program”) or *995 Great Futures Program (“Futures Program”) “derived” from her work as a Mary Kay National Sales Director (“NSD”), they are subject to the self-employment tax. See 26 U.S.C. § 1402(a)-(b); Milligan v. Comm’r, 38 F.3d 1094, 1097 (9th Cir. 1994). It is likewise well-accepted, and again the parties agree, that “deferred compensation” necessarily “derives from” a trade or business within the meaning of § 1402(a)-(b). See Jackson v. Comm’r, 108 T.C. 130, 137-38 (1997) (holding that payments were not subject to self-employment tax because they were not deferred compensation); Milligan, 38 F.3d at 1099 (9th Cir. 1994) (same). The parties therefore agree that if the Family Program and the Futures Program payments are deferred compensation, they are subject to the self-employment tax. But the parties dispute whether Program Payments are, in fact, deferred compensation.
A.
The Majority sides with the Commissioner of the Internal Revenue Service (“Commissioner” or “IRS”) and holds that the payments are “deferred compensation” under the Danielson rule. The Danielson ■rule permits the Commissioner of the IRS to bind a taxpayer to the tax consequences of her agreement, as construed by the Commissioner, unless the taxpayer “ad-duc[es] proof which in an action between the parties to the agreement would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc.” Danielson, 378 F.2d at 775.
In Danielson, the stockholders of Butler County Loan Company (“Butler”) decided to sell the company to Thrift Investment Corporation (“Thrift”) for $374 per share. 378 F.2d at 773. Thrift drafted the sales agreement and allocated $222 per share to the contract for the sale of stock and $152 per share to a covenant not to compete because the allocation to the covenant provided favorable tax consequences for Thrift. Id. After signing the sales agreement and receiving the funds, each of the Butler stockholders reported the entire sum he or she received as capital gains. Id. at 773-74. The Commissioner issued a notice of deficiency with respect to the sum attributable to the covenant not to compete. Id. at 774.
In the Commissioner’s view, that portion of the payment was taxable as ordinary income, that is, at a higher rate than capital gains. Id. at 774. Upon the stockholders’ petitioning for a redetermination of the deficiency, the Tax Court ruled in favor of the stockholders, holding that “the covenants were not realistically bargained for by the parties and that the amounts allocated thereto by Thrift were in reality that part of the purchase price of the stock which represented a premium on corporate receivables.” Id.
The Commissioner appealed the decision. Id. On appeal, the Third Circuit formulated the Danielson rule and reversed the Tax Court, holding that the taxpayers could not escape the tax consequences of the sales agreement’s explicit allocation of $152 per share to the covenant not to compete. Id. at 774-79.
We’ve adopted the Danielson rule and applied it in factually similar situations to the one found in Danielson. See Plante, 168 F.3d at 1280-81 (applying Danielson rule to hold a taxpayer to a Stock Purchase agreement’s designation of a sum as a “capital contribution”); Spector v. Comm’r, 641 F.2d 376, 383-86 (5th Cir. 1981) (applying Danielson rule to conclude that a buy-out agreement carefully and intentionally structured as a liquidation was a “liquidation,” as opposed to “sale” *996 subject to capital-gains tax).[1] We’ve also added our own gloss to the rule, explaining that “[w]hen a taxpayer characterizes a transaction in a certain form, the Commissioner may bind the taxpayer to that form for tax purposes.” Plante, 168 F.3d at 1280.
Here, the Majority asserts that Peterson is bound by the Danielson rule because she “consented” to the characterization of Program Payments as “deferred compensation.” Maj Op. at 986-89; see also id. at 987 n. 29. But Peterson never consented to Mary Kay’s characterization in such a way that she could herself be said to have characterized the Program payments in the Danielson sense.
Instead, Peterson entered into agreements to enroll in the Family Program in 1992 and the Futures Program in 2005, both of which contained provisions permitting Mary Kay to later unilaterally “amend, modify or terminate” the Programs “at any time and in any manner.”
Years later, Mary Kay exercised that authority by “amending” the agreements to characterize the Program payments as “a non-qualifxed deferred compensation ar-rangement” intended to meet the requirements of a non-qualified compensation plan under Section 409A of the I.R.C.[2] According to the Majority, Peterson “consented” to Mary Kay’s unilateral characterization of Program payments as “deferred compensation” in the sense that she had previously consented to Mary Kay’s authority to unilaterally amend the Programs. The Commissioner argues, and the Majority agrees, that Peterson is therefore prohibited from challenging the “deferred compensation” characterization by the Danielson rule.
I respectfully disagree. To be clear, I do not, as the Majority suggests, dispute that Peterson consented to Mary Kay’s amendment of the Agreements to include the language in the 2008 Amendments as - a matter of contract law. See Maj. Op. at 987 n. 29. Rather, I take issue with the Majority’s second-order conclusion that Peterson’s consent to unilateral amendments to the Programs somehow permitted Mary Kay to bind Peterson to its post-hoc characterization of the Program payments for purposes of applying the judicially crafted Danielson rule. Indeed, the Amendments did not purport to amend the Programs *997 substantively but instead to simply characterize the Programs as they existed before the Amendments.
As an initial matter, no court, to my knowledge, has applied the Danielson rule to bind a taxpayer to her counterparty’s ex post facto, unilateral characterization of a transaction. Neither the Majority nor the Commissioner points to any such authority. Instead, the cases applying the Daniel-son rule have done so where the taxpayer herself either (1) executed a document at the time of the transaction explicitly characterizing a transaction in a particular form;[3] or (2) intentionally structured a transaction in a particular form for tax purposes.[4] Indeed, one of our sister circuits has held that the Danielson rule cannot be “meaningfully applied” in cases where the transacting parties did not mutually and specifically agree to a particular term in a contract. See Patterson v. Comm’r, 810 F.2d 562, 572 (6th Cir. 1987). In sum, I have not been able to find any direct support, in this Circuit or anywhere else, for the Majority’s application of the Danielson rule to bind Peterson to Mary Kay’s post-consummation, unilateral characterization of the Program agreements.
Nor should the Danielson rule apply in this case. The Danielson rule serves two purposes, neither of which is vindicated by the Majority’s decision. First, the rule seeks to prevent a party from unjustly enriching itself by unilaterally altering the intended tax consequences of a transaction after consummation. See Danielson, 378 F.2d at 775. The Danielson Court explained as follows:
[T]o permit a party to an agreement ... to attack [a] provision for tax purposes, absent proof of the type which would negate it in an action between the parties, would be in effect to grant, at the instance of a party, a unilateral reformation of the contract with a resulting unjust enrichment. If allowed, such an attach [sic] would encourage parties unjustifiably to risk litigation after consummation of a transaction in order to avoid the tax consequences of their agreements. And to go behind the agreement at the behest of a party may also permit a party to an admittedly valid agreement to use the tax laws to obtain relief from an unfavorable agreement.
Of vital importance, such attacks would nullify the reasonably predictable tax consequences of the agreement to the other party thereto. Here the buyer would be forced to defend the agreement in order to amortize the amount allocated to the covenant. If unsuccessful, the buyer would lose a tax advantage it had paid the selling-taxpayers to acquire. In the future buyers would be unwilling to pay sellers for tax savings so unlikely to materialize.
Id. Thus, the first purpose of permitting the Commissioner to bind a taxpayer to the form in which she initially characterized a transaction is to prevent unilateral, ex post facto contract revisions. As a re- *998 suit, the rule discourages parties from risking litigation by attempting to unilaterally reform their agreements post-consummation, and it ensures that future parties can reliably allocate the tax consequences of their transactions.
The Danielson rule also serves as a prophylactic to prevent the Commissioner from pursuing unnecessary “whipsaw” litigation. See id. at 775; Plante, 168 F.3d at 1281. If two taxpayers adopt divergent characterizations of the proceeds of a single transaction, the Commissioner faces the possibility of “los[ing] out on revenue that logically should have come from one of the parties.” N. Am. Rayon Corp. v. Comm’r, 12 F.3d 583, 587 (6th Cir. 1993). In these instances, the Commissioner is “confronted with the necessity for litigation against both buyer and seller in order to collect taxes properly due.” Danielson, 378 F.2d at 775. So we’ve explained that the second purpose of binding taxpayers to their characterizations of their transactions under the Danielson rule “is to prevent the IRS from being ‘whipsawed’: litigating against two parties ... to collect tax from only one party.” Plante, 168 F.3d at 1281.
Applying the rule here stands the first purpose for which the rule was formulated on its head. Peterson, the taxpayer, made no attempt to alter the express terms of the transaction that she and Mary Kay agreed to at formation; she merely seeks review and enforcement of the terms of the Programs themselves. Only Mary Kay has arguably attempted to alter the tax consequences flowing from the substantive terms of the Programs to which the parties agreed.
In these circumstances, applying the Danielson rule does not prevent a unilateral, post-consummation contract reformation. Instead, the Majority’s application of the rule insulates Mary Kay’s unilateral, ex post facto characterization of the Program payments from meaningful review. As a result, today’s decision encourages parties to risk litigation by attempting unilateral, post-consummation contract reformations to avoid the tax consequences of their transactions. Another result of today’s decision is that parties will be less certain about the tax consequences of a transaction where the agreement contains a unilateral amendment provision — whichever party has the power to amend the agreement will be able to alter those consequences by simply re-characterizing the transaction after consummation.
As a result, the Majority’s application of the Danielson rule here conflicts with the first purpose the rule was meant to serve. See Danielson, 378 F.2d at 775. The only way for us to vindicate the first purpose of the Danielson rule in cases like this one is to set aside the Danielson rule and look through to the economic realities of the transaction.[5]
*999 Nor does applying the Danielson rule in this case vindicate the rule’s second purpose of preventing unnecessary whipsaw litigation. The Danielson rule was never intended to entirely eliminate the need for the Commissioner to ever pursue litigation against both parties to an agreement, as evidenced by the rule’s own carve-out for cases where a taxpayer “adducfes] proof which in an action between the parties to the agreement would be admissible to alter [the Commissioner’s] construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc.” Danielson, 378 F.2d at 775.
Instead, the rule eliminates the need for the Commissioner to pursue litigation against both parties in a very particular set of cases. Where a taxpayer initially agrees to an express contractual characterization or form and later attempts to re-characterize the term or form, the Daniel-son rule acts as a prophylactic to prevent the IRS from having to pursue the taxpayer’s counterparty out of a concern that a court will agree with the taxpayer’s ex post facto re-characterization. See Plante, 168 F.3d at 1281-82 (the Danielson rule prevents the IRS from having to pursue whipsaw litigation by preventing a party from “altering] the express terms of his contract by arguing that the terms did not represent economic reality” (emphasis added)); see also Patterson, 810 F.2d at 572 (“The Danielson rule can only be meaningfully applied in those cases where a specific amount has been mutually allocated to the covenant as expressed in the contract.” (emphasis added)).
The Danielson rule, however, has no application in cases where, as here, the taxpayer does not seek to avoid an express contractual term or form. See Plante, 168 F.3d at “1282; Patterson, 810 F.2d at 572. In these cases, the Commissioner must resort to litigating the tax deficiency on the merits and, if need be, “asserting] inconsistent positions and ... assessing] deficiencies against more than one person for the same tax liability if there is an accepted legal basis for each assertion.” Gerardo v. Comm’r, 552 F.2d 549, 555 (3d Cir. 1977). In other words, the Commissioner must go ahead and pursue whipsaw litigation. Indeed, the reason courts permit the Commissioner to pursue whipsaw litigation is to protect the public fisc from any whipsaw effect in cases where “there is an accepted legal basis” for asserting a single tax deficiency against multiple parties. Id.-, see also Bouterie v. Comm’r, 36 F.3d 1361, 1374 (5th Cir. 1994) (holding that, when the IRS asserts a single tax deficiency against multiple parties, each assertion “must have a reasonable basis in fact and law”). In other words, courts permit the Commissioner to pursue whipsaw litigation precisely because sometimes, as here, more than one party is arguably liable for a single tax deficiency.
Here, Peterson never expressly agreed to a characterization of the Program payments as “deferred compensation” in the Danielson sense. Instead, as the Commissioner implicitly acknowledges, there is a reasonable legal basis to conclude that Program payments are either (1) deferred compensation, in which case Peterson is liable for the tax deficiency; or (2) payments for a covenant not to compete, in which case Mary Kay would be responsible for incorrectly deducting the payments on its tax returns. In these circumstances, I would hold that the Commissioner may not rely on the Danielson rule in lieu of pursuing actual whipsaw litigation to resolve a *1000 genuine dispute about whether Peterson or Mary Kay is responsible for the tax deficiency at issue. The Majority’s contrary conclusion, in my opinion, does not vindicate the rule’s prophylactic purpose of preventing unnecessary whipsaw litigation; it prevents necessary whipsaw litigation.[6]
In sum, I could find no precedential support for the application of the Daniel-son rule in cases, such as this one, where a taxpayer did not expressly agree to a particular characterization or contractual form at the time of a transaction. Nor do the purposes of the Danielson rule support the expansion of the rule to cover such cases. For these reasons, I respectfully disagree with the Majority’s application of the Danielson rule in this case and would hold that Peterson is not bound by Mary Kay’s unilateral, ex post facto characterization of Program payments as “deferred compensation.”[7]
*1001 B.
Just because the Danielson rule does not apply, however, does not necessarily mean that the payments are not “deferred compensation,” and thus subject to the self-employment tax. Instead, when the Danielson rule is inapplicable, we look to the substance of the transaction to determine its nature. See, e.g., Plante, 168 F.3d at 1280 (noting that, were the Danielson rule inapplicable, we would apply a 13-factor test to determine whether a sum is a loan or a capital contribution).
In Jackson v. Commissioner, 108 T.C. 130 (1997), the Tax Court summarized what a traditional deferred-compensation agreement looks like. It stated,
In a typical deferred compensation arrangement, an employee wants to postpone receiving a portion of the income to which he or she is entitled with the understanding that the income will be paid at a later time, usually upon retirement or other termination. In these cases the employee chose to receive less than his or her agreed compensation when earned with the understanding that it would be paid out at some later time. The employer ordinarily contributes the amount designated by the employee to a fund established for that purpose.
Id. at 137 (internal citations omitted).
Our sister circuits have provided additional guidance on the deferred-compensation inquiry. For instance, in Gump v. United States, the Federal Circuit held that the extended earnings an insurance salesman received after retirement were not deferred compensation. 86 F.3d 1126, 1128-29 (Fed. Cir. 1996). The Federal Circuit rested its conclusion on the following facts: the salesman received all of the commissions he was entitled to prior to receiving the extended earnings; the extended earnings were “not derived by holding back a portion of [the salesmanj’s salary”; and disbursement of the extended earnings was conditioned on the salesman’s qualified cancellation of his insurance relationships such that he had no vested right to receive the extended earnings. Id. Likewise, in Milligan v. Commissioner, the Ninth Circuit held that payments made to a retired insurance salesman were not deferred compensation because “none of [the salesmanj’s earnings were deferred, i.e., he had no vested right to payment of an identifiable money amount.” 38 F.3d 1094, 1099 (9th Cir. 1994).
Guided by Jackson, Gump, and Milli-gan, I would hold that the Program payments Peterson received were not “deferred compensation” for three reasons. First, Peterson was never asked to defer any portion of her income until a later date. Second, before Peterson’s retirement, Mary Kay fully compensated Peterson for all of the commissions she was entitled to receive under her NSD agreement. Third, Peterson had no vested right to the Program payments. Instead, they were conditioned on Peterson’s compliance with contemporaneous and future obligations, more specifically, the covenant not to compete. Additionally, as discussed above, both Program agreements contained a unilateral-amendment provision permitting Mary Kay to “amend, modify or terminate the Plans at any time and in any manner.” I have found no constraint in the agreements prohibiting Mary Kay from reducing the Program payments at any time.
*1002 Distinguishing the insurance cases, the Majority suggests that the payments here would be deferred compensation even on the merits because, unlike insurance agents who work by themselves, NSDs “lead and train their ever increasing networks, whose sales generate the NSDs’ commissions before and after their retirement.” Maj. Op. at 993. But in Milligan, the Ninth Circuit held that the extended earnings payments were not deferred compensation despite the fact that the employer could adjust the payments and “[t]he adjusted payment amount depended not upon Milligan’s past business activity, but upon the successor agent’s future business efforts to retain Milligan’s customers.” 38 F.3d at 1099.
Moreover, as the Majority recognizes, NSDs are compensated through commissions on their networks’ sales. NSDs are not directly compensated for leading and training their networks. Even if an NSD provided her network with top-notch training and leadership, she would still receive no compensation if the network did not sell any Mary Kay products. Thus, payments based on commissions generated after an NSD retires cannot be deferred compensation for prior leadership and training— NSDs like Peterson were never compensated for those responsibilities, before or after retirement.
Because the facts here are materially indistinguishable from those in Jackson, Gump, and Milligan, I would hold that Peterson’s Program payments are not “deferred compensation,” and thus not subject to the self-employment tax on this basis.
II.
Even though I would conclude that the Program payments are not “deferred compensation,” that would not conclusively establish that the Program payments are not subject to the self-employment tax. Other types of income may still be subject to the tax, so long as they “derive from a trade or business.” See 26 U.S.C. § 1402(a)-(b). Income “derives from a trade or business” whenever there is “a nexus between the income received and a trade or business that is, or was, actually carried on.” Newberry v. Comm’r, 76 T.C. 441, 444 (1981). Where income does not meet the nexus test but instead derives from a former employee’s compliance with a covenant not to compete, it is not subject to the self-employment tax. Milligan, 38 F.3d at 1098 n. 6.
Three of our sister circuits’ decisions illuminate the nature of the Newberry nexus inquiry. First, in Milligan, the Ninth Circuit analyzed the nexus issue with regard to “termination payments” made to Milligan, a retired insurance sales agent. 38 F.3d at 1098. Milligan and his employer entered into an agreement that provided for termination payments, the amount of which were based on a percentage of Milli-gan’s outstanding policies in the twelve months preceding his retirement. Id. at 1096. Under the agreement, Milligan was eligible to receive termination payments for five years only if he had worked as an agent for at least two years, returned all employer-owned property, and refrained from competition with his employer for one year. Id.
On these facts, the Ninth Circuit held that the termination payments were not subject to the self-employment tax because they did not “derive” from Milligan’s prior business activity. Id. at 1098. The Ninth Circuit reasoned, “To be taxable as self-employment income, earnings must be tied to the quantity or quality of the taxpayer’s prior labor, rather than the mere fact that the taxpayer worked or works for the payor.” Id. (emphasis added). As noted above, the Ninth Circuit first concluded *1003 that the payments were not deferred compensation. Id. at 1099.
Nor, the Ninth Circuit held, did the payments otherwise “derive” from Milli-gan’s prior business activity. The Milligan Court observed that the only link between the quantity or quality of the agent’s prior labor and the payments at issue was Milli-gan’s status as a two-year-plus independent contractor. Id. That link on its own, the court held, was insufficient to satisfy the “derive” requirement. Id. The Court explained that “[i]t is not enough that, had the taxpayer not performed certain services (that were fully compensated for)— not been an independent contractor, for example — the taxpayer never would have received the disputed payments.” Id.
Notably, even though the amount of the payments was partially tied to Milligan’s prior labor, the Ninth Circuit held that the termination payments were not tied to the quantity or quality of Milligan’s prior labor because the amount of the payments was also subject to two adjustments that did not depend on Milligan’s prior labor.
At most, the amount of the Termination Payments, not the payments themselves, actually arose from Milli-gan’s business activity. Milligan had a contingent right to receive an uncertain amount of money or nothing, depending upon the level of his prior business activity leading to compensation in his final year as an agent. The payment amount depended upon the level of his commissions_ on personally-produced policies, i.e., his previous value as a[n] ... insurance agent.
However, in part, even the payment amount did not depend upon the level of Milligan’s prior business activity because the Termination Payments were subject to two adjustments unrelated to any business activity on Milligan’s part for [the employer]. The [employer] adjusted the Termination Payments to reflect the amount of income received on Milligan’s book of business during the first post-termination year, and the number of his personally-produced policies cancelled during that year. If all of Milligan’s customers had cancelled their ... non-life policies during the first post-termination year, then Milligan would have received nothing. The adjusted payment amount depended not upon Milligan’s past business activity, but upon the successor agent’s future business efforts to retain Milligan’s customers and to generate service compensation for [the employer]. In this way too, the disputed Termination Payments did not “derive” from Milligan’s prior services.

Id.

Similarly, in Gump, the Federal Circuit held that the monthly “extended earnings” payments Gump, a retired insurance agent, received from his former employer did not meet the Newberry nexus test and were therefore not subject to the self-employment tax. 86 F.3d at 1127. There, Gump was entitled to receive extended earnings if he worked for the employer for at least five years. Id. The extended-earnings payments were “calculated by reference to the agent’s policy renewal fees for his last twelve months of service, subject to certain adjustments.” Id. Like the Mil-ligan Court, the Federal Circuit held that the extended-earnings payments were not “deferred compensation.” Id. at 1128-29. In addition, the Federal Circuit relied on several significant facts to conclude that the extended earnings were not otherwise “derived” from the Gump’s former business activity.
First, the right to receive extended earnings was conditioned upon the cessation of business activity; that is, cessation was “not just a condition that [had to] be observed to preserve [Gump’s] eligibility *1004 for the [payments]; it [was] a precondition to receiving them.” Id. at 1128. The court reasoned that the payments did not arise or derive from the trade or business, but more accurately derived from the cancellation of that trade or business. Id. Thus, the fact that the payments, in a sense, were “rooted in” Gump’s employment agreement with his former employer was not enough to establish the requisite nexus. Id.
Second, even though the amount of Gump’s extended-earnings payments was tied to the level of renewal commissions generated by Gump in the last twelve months of his employment, that fact alone was insufficient to demonstrate that the extended payments were tied to the quantity or quality of the Gump’s service. Id. at 1129. The Federal Circuit reasoned that “the renewal commissions generated in Gump’s last year determine^] the amount of the extended earnings payment, subject to adjustment, not the right to it”; thus, “[t]he only significance that [could] properly be attached to this amount [was] that it was used as a benchmark to determine how much he would receive if he complied with the agreement.” Id.
The Federal Circuit also noted that Gump’s right to the extended earnings was not dependent his final twelve months of labor because even if he had lost all of his customers, he would have been entitled to the payments (though, under the benchmark, he would have received no money). Id. at 1130. In contrast, had Gump not complied with other contractual requirements, by, for example, failing to return his employer’s property at the end of his employment, he would not have been entitled to any extended earnings. Id. The Federal Circuit held that the amount of the extended earnings was therefore “not tied to the quantity or quality of [Gump’s] labor in any meaningful way.” Id. (internal quotation marks omitted).
Third, the court in Gump relied in part on the fact that the payments were subject to adjustments unrelated to the Gump’s previous business activities. Notably, the employer “could make deductions from the payments if certain large commercial policies were cancelled in the year following [Gump’s] last year of service. This adjustment in the amount he [c]ould receive [wa]s unrelated to the actual quantity or quality of his labor.” Id. at 1128-29.
In Schelble v. Commissioner, the Tenth Circuit also addressed whether the termination payments received by an insurance agent, Schelble, “derived” from his prior business activity. 130 F.3d 1388 (10th Cir. 1997). The court held that, unlike the payments in Milligan and Gump, Schelble’s termination payments did “derive” from his prior labor under the “quantity or quality” test. Id. at 1394. The court distinguished the termination payments Schelble received from those Milligan and Gump received, reasoning,
Although the payments in Milligan and Mr. Schelble’s payments have similar eligibility requirements such as (1) a minimum [yearly] service requirement; (2) relinquishment of company records and policies; and (3) a covenant not to compete, Mr. Schelble’s payments have distinguishing features related to Mr. Schelble’s prior services. For example, unlike the plan in Milligan, Mr. Schelble must have 400 outstanding policies at his termination to be eligible for extended earnings payments. In addition, in contrast to Milligan, the amount of Mr. Schelble’s payments was computed based on Mr. Schelble’s length of service for the Companies. As an agent for the Companies for over fifteen years, Mr. Schelble’s extended earnings payments were calculated using a higher percent *1005 age than if he had only been an agent for five or ten years. Furthermore, unlike the payments in Milligan, Mr. Schelble’s ... payments were calculated solely on the percentage applied to service fees paid to him during the twelve months preceding the Agreement’s termination. No adjustments unrelated to Mr. Schelble’s prior services were made in calculating these payments. Based on these distinguishing factors, we conclude Mr. Schelble’s payments are sufficiently derived from his prior insurance business to constitute self-employment income subject to self-employment tax under 26 U.S.C. § 1401.
Mr. Schelble also relies on Gump.... However, the payment scheme in Gump is nearly identical to that in Milligan and distinguishable from Mr. Schelble’s payment scheme. For the same reasons we reject Milligan, we also find Gump does not apply Mr. Sehelble’s case.
Id. at 1893-94 (internal citation omitted).
Applying the Newberry test to Schel-ble’s payments, the Tenth Circuit held that a nexus existed between Schelble’s termination payments and his prior labor. Id. at 1394. The Court first conceded that, as Schelble argued, the payments arose from the cessation of his employment, not his prior labor. Id. But it concluded that there was “[njevertheless” a nexus because “the right to and amount of payments are tied to the quantity of policies sold for the [employer], the length of Mr. Schelble’s prior service and the amount of his prior commissions.” Id.
The Majority contends that Milligan, Gump, and Schelble are inapposite because all three cases involve insurance agents and are therefore distinguishable on four bases. Maj. Op. at 990-92. First, the Majority observes that, unlike sales of Mary Kay’s cosmetic products, insurance policies have to be renewed. Id. at 991-92. Second, the Majority notes that the calculation of post-retirement benefits for insurance salesmen is based on methods and concepts that are germane to the insurance business. Third, the Majority suggests that, unlike in the insurance cases, the Program payments here are deferred compensation on the merits. Id. at 991-92. Fourth, the Majority notes that the Mary Kay Programs “are one of a kind” and “unique.” Id. at 993. In support of this last contention, the Majority observes that one distinction between Mary Kay’s Futures Program and the insurance cases is that the insurance cases “do not involve sales networks in foreign countries.” Id. at 993 n. 43.
I agree with the Majority that these are distinctions between the insurance cases and Peterson’s case. But I respectfully disagree that these distinctions render Milli-gan, Gump, and Schelble inapposite. The courts in Milligan, Gump, and Schelble did not explicitly purport to limit their holdings to insurance cases; nor does- anything in their analyses suggest that their reasoning is limited to cases involving insurance agents. Instead, each court started with the language of 26 U.S.C. § 1402(a)-(b), recognized the continuing vitality of New-berry (a case involving insurance proceeds, but not retired insurance agents), and applied the test to the post-retirement payments at issue. See Schelble, 130 F.3d at 1391-94; Gump, 86 F.3d at 1127-30; Milli-gan, 38 F.3d at 1097-1100.
Nor is it clear to me why the distinctions highlighted by the Majority would alter the applicability of these decisions. The fact that insurance contracts have to be renewed unlike the fungible products sold by Mary Kay suggests only that insurance companies do not need their customers to affirmatively “re-up” as frequently. To the extent that the Majority means to suggest that the renewable contracts indicate that *1006 there is a difference in kind between (a) the relationship Of a retired insurance agent to his former customers and employer, and (b) the relationship of a retired NSD to her former network and Mary Kay, I do not see a meaningful difference or how any difference would impact our post-retirement payment analysis.
I also do not think that it matters that insurance companies calculate postretirement payments to former insurance agents using methods and concepts germane to the insurance industry. As described above, the Newberry nexus analyses in Milligan, Gump, and Schelble turn on whether the payments at issue are “deferred compensation”; whether the payments are for the cessation of business; whether the payments are subject to adjustments unrelated to the former employee’s prior labor; whether eligibility for the payments and the determination of the amount of the payments are related to the quantity of the former employees’ work, beyond a requirement that the employee have worked some number of years in order to receive the payments; and whether the amount of the payments is dependent on the labor of employees that succeeded the former employee or on the employee’s own labor. See Schelble-, 130 F.3d at 1391-94; Gump, 86 F.3d at 1127-30; Milligan, 38 F.3d at 1097-1100. As it turns out, all of these inquiries have meaningful application in the context of this case as well.
To the Majority’s suggestion that the payments here are deferred compensation, unlike the payments in the insurance cases, I respectfully disagree for the reasons described above. See supra at pp. 976-77. And, respectfully, the Majority’s fourth distinction — that the Mary Kay Programs are one of a kind because, among other things, they involve sales networks in foreign countries — does not necessarily make them insusceptible to the general analytical framework deployed in Milligan, Gump, and Schelble.
Notably, the Majority itself relies on an insurance case. The Majority cites Erickson v. Commissioner, T.C. Memo. 1992-585 (1992), for the proposition that “[p]ay-ments with the same character as prior commissions constitute income derived from a petitioner’s self-employment.” Maj. Op. at 991. I disagree with the Majority’s gloss on the holding in Erickson — there, unlike the payments in Milligan and Gump, the post-termination payments were directly tied to both the quantity and quality of the former agent’s labor, with a guarantee that the payments could not fall below a certain percentage. See Erickson, T.C. Memo 1992-585, at *1. But, more importantly, either cases involving insurance agents are or are not, as a class, inapplicable to non-insurance cases.
Guided by Milligan, Gump, and Schel-ble, I would conclude that a nexus exists between the Family Program payments and Peterson’s prior Mary Kay labor, but not with respect to the Futures Program payments. Here, payments under both Programs are tied to the cessation of Peterson’s prior Mary Kay labor. In order to receive payments under the Programs, Peterson was required not to compete with Mary Kay. This counsels in favor of holding that the payments are not derived from Peterson’s prior labor. See Milligan 38 F.3d at 1098 n. 6 (observing that payments derived from an employee’s cessation of labor and compliance with a non-competition covenant do not meet the nexus test); see also Gump, 86 F.3d at 1128 (payments derived from a former employee’s cessation of labor are not derived from the employee’s former labor even where the payments are “rooted in” the employee’s former employment agreement). But it is not dispositive of the “quality or quan *1007 tity” nexus inquiry. See Schelble, 130 F.3d at 1394.
As for the quantity inquiry, I would hold that the payments under both Programs are tied to the quantity of an NSD’s service, but only in the threshold status sense that the Milligan court found insufficient, on its own, to establish that payments necessarily “derive” from a taxpayer’s pri- or labor. To be eligible for payments under both Programs, an individual must have served as an NSD for at least 5 years prior to her retirement. If an NSD serves for 15 years prior to retirement, she is eligible to receive payments at a rate of 60%, regardless of her age at retirement. If, however, an NSD retires prior to serving 15 years, the percentage of commissions she receives is based upon her age at retirement, varying from a 40% rate at age 55 to a 60% rate at age 65. Once an NSD reaches age 65, she will receive payments at the 60%, regardless of whether she served for 5 or 25 years. In sum, an NSD’s eligibility for receiving Program payments at a particular rate is dependent on her status as either (1) having served at least 5 years and attained the age of 55; or (2) having served 15 years.
These eligibility requirements are akin to the two-year-plus status requirement that the Milligan Court found insufficient to satisfy the nexus test on its own. 38 F.3d at 1098. I agree with the Milligan Court that, without more, this type of “link between the disputed payments and any business activity carried on ... does not satisfy the ‘derive’ requirement.” Id. As the court in Milligan explained, “It is not enough that, had the taxpayer not performed certain services (that were fully compensated for) ... the taxpayer never would have received the disputed payments.” Id. Here, the requirements that an NSD perform Mary Kay services for 5 years and reach 55 years of age, or serve as an NSD for 15 years, are threshold eligibility requirements for Program pay- , ments. Those status requirements indicate only that the NSD performed services, fully compensated for at the time, sufficient to receive the disputed payments. Therefore, while I would conclude that a relationship exists between the quantity of Peterson’s prior labor and the Program payments, that relationship, on its own, does not satisfy the Newberry nexus test.
But I would hold that the Family Program payments still meet the nexus test because the amount of payments Peterson received under the Family Program was directly tied to the quality of her Mary Kay labor. The amount Peterson received under the Family Program payments was equal to 60% of the average of her annual commissions for the three years in which she had the highest commissions among the five years preceding her retirement. Like the payments in Schelble and unlike the payments in Milligan and Gump, this amount was not subject to any adjustments, let alone adjustments unrelated to Peterson’s prior labor. Schelble, 130 F.3d at 1393; Gump, 86 F.3d at 1128-29; Milli-gan, 38 F.3d at 1099. Because the amount of the Family Program payments were not subject to any adjustments, Peterson’s labor during her three highest commission years in the last five years of service cannot be considered a benchmark akin to Gump’s final twelve months of service— the quality of Peterson’s labor is determinative of the amount of her payments. Cf. Gump, 86 F.3d at 1129-30. As a result, the amount of the payments Peterson received under the Family Program was entirely dependent on the quality of her prior Mary Kay labor.
In contrast, I would hold that the Futures Program payments do not meet the nexus test because the amount of the payments Peterson received under the Fu *1008 tures Program is entirely independent of the quality of her prior Mary Kay labor. Under the Futures Program, Peterson is entitled to receive 60% of the commissions she would have received on wholesale purchases of Mary Kay products by individuals in her network located outside the United States. In other words, the amount of Futures Program payments Peterson is entitled to receive is entirely dependent on the quality of other, non-retired Mary Kay laborers.
The Commissioner argues that the Futures Program payments still “derive from” the quality of Peterson’s previous work because the amount of money that her network generated after she retired reflected how well she had trained her network while she was active. The Majority agrees. Maj. Op. at 990 n. 36; 991 n. 39. I, however, disagree.
In Milligan, the Ninth Circuit held that the fact that Milligan’s employer could reduce his payments based on how many of his former customers cancelled their insurance policies in the year after his retirement indicated that “[t]he adjusted payment amount depended not upon Milligan’s past business activity, but upon the successor agent’s future business efforts to retain Milligan’s customers.” 38 F.3d at 1099. The Ninth Circuit determined that that counseled in favor of holding that the payments did not “derive” from Milligan’s pri- or labor. Id.
Likewise, in Gump, the Federal Circuit held that because Gump’s former employer “could make deductions from the payments if certain large commercial policies were cancelled in the year following his last year of service,” the payments were “unrelated to the actual quantity or quality of [Gump’s] labor.” 86 F.3d at 1128-29. Here, the fact that Peterson might receive reduced payments under the Futures Program based entirely on wholesale purchases by members of her former international network similarly counsels in favor of holding that the Futures Program payments are not tied to the quality of Peterson’s prior labor and therefore not “derived” from that labor.[8]
Instead, I would hold that the Futures Program payments derive from Peterson’s compliance with the agreement’s covenant not to compete. The majority contends that the payments did not derive from the covenant not to compete because the covenants were not determinative in Peterson’s receiving her post-retirement commissions from the foreign networks she trained. Maj. Op. at 989-90. But that conclusion conflicts with the language of the non-compete provision itself: “In consideration of the rights and privileges contained in the Program and other valuable consideration referenced herein, Participant agrees to faithfully observe and comply with the ... [non-compete] covenants and agreements for so long as Participant is *1009 entitled to receive awards under the Program....” On these facts, I would hold that the Futures Program payments are derived from the non-compete agreements and are therefore not subject to the self-employment tax. See Milligan, 38 F.3d at 1098 n.6.[9]
In sum, I would hold that the Family Programs meet the nexus test and are therefore subject to the self-employment tax. I therefore concur in the portion of the Majority’s opinion holding that the Family Program payments are subject to the self-employment tax. The Futures Program payments, on the other hand, are not, in my opinion, sufficiently related to either the quantity or the quality of Peterson’s prior labor to meet the nexus test. Instead, those payments appear to be derived from I therefore respectfully dissent from the portion of the Majority’s opinion holding that the Futures Program payments are subject to the self-employment tax.
For these reasons, I respectfully dissent in part, and I concur in part in the judgment.

. Pursuant to Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th-Cir. 1981) (en banc), opinions of the Fifth Circuit issued prior to October 1, 1981, are binding precedent in the Eleventh Circuit.

. The amendments became effective December 1, 2008, one month before Peterson retired, approximately sixteen years after Peterson executed the Family Program agreement, and three years after she executed the Futures Program agreement. In relevant part, the 2008 Amendments read,
“Section 10.9 is added to specifically reflect compliance with Section 409(A) of the Internal Revenue Code:”
Internal Revenue Code Status. The Program [Plan] is intended to be a nonqualified deferred compensation arrangement and is not intended to meet the requirements of Section 401(a) of the Code. The Program [Plan] is intended to meet the requirements of Section 409A of the Code and shall be construed and interpreted in accordance with such intent. No person connected with the Program [Plan] in any capacity, including but not limited to [Mary Kay] and any affiliates of [Mary Kay] and their respective directors, officers, agents and employees, makes any representation, commitment or guarantee that any tax treatment, including but not limited to federal, state and local income, estate, and gift tax treatment, will be applicable with respect to any amounts deferred or payable under the Program [Plan] or that such tax treatment will apply to or be available to a Participant on account of participation in the Program [Plan].[2]
Mary Kay Amend. No. 1 § 10.9, Family Program & Futures Program.

. See, e.g., Plante, 168 F.3d at 1281 (applying the Danielson rule where taxpayer executed stock purchase agreement explicitly characterizing a sum as a "capital contribution”); Bradley v. United States, 730 F.2d 718, 720 (11th Cir. 1984) (applying the Danielson rule where taxpayer executed a sale agreement and later attempted to argue that the transaction was not "sale” but an "option” agreement); Danielson, 378 F.2d at 771 (taxpayers signed sales agreement explicitly allocating portions of the proceeds of a sale to a covenant not to compete).

. See, Spector, 641 F.2d at 383-86 (Danielson rule precluded a taxpayer from arguing that a transaction was a "sale” where the taxpayer intentionally structured the transaction as a "liquidation” for tax purposes).

. Responding to this point, the Majority contends that this case does not implicate the first purpose of the Danielson rule — preventing parties from unjustly enriching themselves by preventing them from re-characterizing transactions ex post facto — because Mary Kay did not seek to unjustly enrich itself. Maj. Op. at 988 n. 31. As an initial matter, I respectfully suggest that the Majority's conclusion that the first purpose of the Danielson rule is not implicated in this case, whatever the reasoning, counsels against applying the Danielson rule at all. But in any event, the Majority does not focus on the right party. The Commissioner here is trying to collect taxes from Peterson, not Mary Kay. Thus, the Danielson concern here is whether Peterson, not Mary Kay, is attempting to unjustly enrich herself. In other words, the purpose of applying the Dan-ielson rule in this case would be to ensure that Peterson does not unfairly shift tax liability to Mary Kay via a post-hoc re-characterization of their transaction. I only suggest that applying the Danielson rule here might permit Mary Kay to unjustly enrich itself to un *999 derscore my broader point that applying the Danielson rule in circumstances like these actually incentivizes parties to engage in the very post-hoc-tax-liability shifting the rule is meant to guard against.

. The Majority responds that "[bjecause the IRS seeks tax[es] from the Petersons solely, its being 'whipsawed' is not an issue in this case.” Maj. Op. at 987 n. 29. If the anti-whipsaw concern underlying the Danielson rule is not implicated here, whatever the reasoning, that counsels against applying the Danielson rule at all. In any event, I respectfully disagree that this case presents no whipsaw concerns. "Whipsaw” is a concern whenever more than one party is arguably liable for a single tax deficiency — if each taxpayer contends that he or she is not liable for the deficiency, the IRS may be forced to pursue both parties in court to recover a single deficiency. Here, Peterson and Mary Kay have adopted divergent characterizations of the Program payments and, as I noted, the IRS has conceded that each could arguably be liable for the single tax deficiency depending on the appropriate characterization of the payments. Thus, a concern exists that the IRS could be whipsawed by Peterson and Mary Kay’s divergent characterizations of the payments. My point is that the whipsaw concern here is materially different than the one the Danielson rule was crafted to address. The Danielson rule seeks to nip unnecessary whipsaw litigation in the bud by holding parties to their initial, agreed-upon characterization of transactions. In other words, the Danielson rule was designed to prevent parties from whipsawing the IRS by adopting divergent characterizations of transactions when they initially agreed to a particular characterization. Here, however, Peterson and Mary Kay never agreed to Mary Kay’s "deferred compensation” characterization at the outset. Instead, Mary Kay unilaterally characterized the Program payments years after the transaction was consummated via the unilateral amendment provisions in the Program agreements. We should not apply the Danielson rule and permit the Commissioner to bind Peterson to Mary Kay’s ex post facto re-characterization because Peterson is not attempting to pull a fast one on the IRS by backtracking on an initial, mutual characterization of the payments.

. The Majority contends that we are bound to apply the Danielson rule under Spector v. Commissioner of Internal Revenue, 641 F.2d 376, 383-86 (5th Cir.1981), Bradley v. United States, 730 F.2d 718, 720 (11th Cir. 1984), and Plante v. Commissioner of Internal Revenue, 168 F.3d at 1280-81; and that any decision not to apply the Danielson rule would violate the prior-precedent rule. Maj. Op. at 987-88 n. 30. In making this point, the Majority appears to misunderstand my argument, framing my argument as premised on the proposition that we need not apply prior precedent any time the facts of a new case are not identical to those of a prior case. Id. To be clear, that is not my position. Rather, my point is that the facts of Spector, Bradley, Plante, and every other case applying the Danielson rule, including Danielson itself, are not just different from the facts here, they are materially distinguishable: in each of those cases, the taxpayer herself either (1) executed a document at the time of the transaction explicitly characterizing a transaction in a particular form; or (2) intentionally structured a transaction in a particular form for tax purposes. See supra pp. 972-73. Here, Peterson did neither. And, as I described above, applying the Danielson rule on the facts of this case disserves the two purposes of the rule. Declining to apply the Danielson rule in this case, therefore, would not violate the prior-precedent rule. Instead, it would merely recognize that the Danielson rule has not been applied, and should not be applied, in the materially distinguishable situation where *1001 a taxpayer’s counterparty ex post facto unilaterally characterizes a transaction to its benefit.

. The Commissioner argued that the payments under both Programs were also tied to the quantity of an NSD’s service in that an NSD with 5-14 years of service and who was at least 55 years old could receive a higher payment rate the longer she worked. The Commissioner argued that this is akin to the payments in Schelble, where the insurance agent was entitled to a higher percentage of his commission based on his years of service. Schelble, 130 F.3d at 1393. In Schelble, however, the percentage rate corresponded directly with the insurance agent's years of service. See id. ("As an agent for the Companies for over fifteen years, Mr. Schelble’s extended earnings payments were calculated using a higher percentage than if he had only been an agent for five or ten years.”). Here, in contrast, the rate at which a five-plus year NSD would receive payments was tied directly to her age, not her years of service. Thus, an NSD that retired at the age of 55 with 7 years of service would receive the same rate of Program payments (40%) as an NSD that retired at the age of 55 with 14 years of service.

. Without more, the “[i]n consideration of” language does not dictate the conclusion that the Futures Program payments are "derived” from Peterson’s compliance with the Program’s non-compete provision and not from her prior labor. Indeed, the noncompetition provision of the Family Program contains the same ”[i]n consideration of” language, and, as noted above, I would conclude that those payments do derive from Peterson’s prior Mary Kay labor. The difference, for me, is that unlike the Family Program, where the amount of Peterson’s payments depends entirely on the quality of Peterson’s efforts in her final five years of her Mary Kay employment, the amount of the Futures Program payments does not depend on Peterson’s prior Mary Kay labor. It is the absence of any nexus between the Futures Program payments and Peterson’s prior Mary Kay labor in combination with the "[i]n consideration of” language that drives me to the conclusion that the Futures Program payments "derive” from Peterson’s compliance with that Program’s non-compete provision and not from her prior labor.